[PHILADELPHIA, JANUARY 28, 1833.]

In the matter of the alleged nuncupative will of PRISCILLA E. YARNALL, deceased.

APPEAL.

Nuncupative wills are not to be favoured.

To entitle a nuncupative will to probate, the provisions of the law must be strictly complied with, and the absence of due proof of a strict compliance with any one of them is fatal.

The testamentary capacity of the deceased and the *animus testandi*, at the time of making the alleged nuncupative will, must be proved by the clearest and most indisputable testimony; and it must plainly appear from the evidence, that the instrument proposed to be proved, contains at least the true substance and import of the declarations made by the deceased.

The *rogatio testium* must be at the time the alleged nuncupative will is made, which must be proved by two or more witnesses, who were then present; and it is not enough if the alleged testator declare his will first in the presence of one witness, and afterwards in the presence of another. The requisite number of witnesses must be present, and called on at the same time to attest the will.

A nuncupative will is not good unless it be made by the testator when he is *in extremis*, or overtaken by sudden and violent illness, and has not time or opportunity to make a written will.

Therefore, where the alleged testatrix had been afflicted with a pulmonary consumption for about six months before her death, testamentary declarations, made nine days before her death, during which period, though weak in body, she retained the possession of all her faculties until the last hour of her life, were *held*, not entitled to probate as a nuncupative will.

THIS case came before the court on an appeal from the decree of the Circuit Court of *Chester* county.

On the 23d of *April*, 1831, a paper writing purporting to be the nuncupative will of *Priscilla E. Yarnall*, deceased, was exhibited for probate by *Walker Yarnall*, a legatee and devisee under the will, in the office of the Register for the probate of wills, and granting letters of administration in and for the county of *Chester*. The Register, after having examined the evidence and heard counsel, decreed that the alleged nuncupative will could not be admitted to probate, and dismissed the application. From this decree *Walker Yarnall* appealed to the Register's Court, who after hearing, affirmed the decree of the Register.

The paper offered to the Register for probate, was in these words:

"Notes of a verbal will of *Priscilla E. Yarnall*, who departed this life on the 27th of the 3d month, 1831, committed to writing on the 30th of the same month, by *Walker Yarnall*.

"On the 18th day of the 3d month, *Priscilla E. Yarnall* said, that she gave to her uncle, *Walker Yarnall*, all goods and moneys which belonged to her, and every thing that she had or could dispose of, except her bed, &c. and requested or wished her uncle, *Walker Yarnall*, if all things settled right, to give *Robert Frazer*, such of her

(Case of Priscilla E. Yarnall's will.)

school books as may be of use to him; also, some spoons which were marked with the initials of *Robert Frazer's* first wife."

" She gave to *Elizabeth Black*, her bed-steads, bed and bedding, and every thing belonging to her bed furniture; also, some sheets and coverlids or bed-quilts which she believed were at her uncle *Robert Pennell's*, which she gave her, not as a compensation, but as a kind nurse, and desired that *Elizabeth Black* should be well paid for her attendance and care, besides.

" On the 19th said she had forgot her clock, but would think of it while the family took tea; after tea she said, she did not see that she wished the clock taken from her uncle *Walker*, but he must keep it.

" Same day, 19th, she wished the clothes that were in a trunk in the garret, to be brought to her. She then laid out a crape shawl, and said she wished that to be given to her aunt, *Susan Hannum*; and silk shawl to be given to *Betsey Barton*. She then directed her aunt, *Elizabeth Yarnall*, to give the remainder of her mother's clothes to her aunt, *Sarah Meredith*; also, requested her aunt, *Elizabeth Yarnall*, to give her aunt, *Sarah Meredith*, a bonnet box and two bonnets which were in a closet in her room at *Joseph Parry's*. She gave her uncle, *Walker Yarnall*, her horse, and requested that he would not part with it to any person."

" 3d month, 27th. A short time before her decease, she said, he is to have them spoons, and *Betsey* the beds, &c. three blankets and three coverlids. Thee knows what I gave thee, aunt *Sally*, the clothes and bonnets; thee knows, looking at her aunt *E. Yarnall*, and uncle *Walker* knows all about it."

The paper above stated, was endorsed: " Paper offered for probate to the Register, as containing the nuncupative will of *Priscilla E. Yarnall, April*, 23d, 1831." It was filed in the Register's office, on the 15th day of *June*, 1831.

Another paper was also offered to the Register's Court, as containing the alleged nuncupative will. This memorandum was taken down by the counsel of *Walker Yarnall*, in the Register's Court, from the examination of the witnesses. It was as follows:—

" Nuncupative will of *Priscilla E. Yarnall*, deceased, made on the 17th and 18th days of *March*, 1831, and re-published on the 27th of the same month and year, at the house of her habitation or dwelling, during her last sickness, and in substance as follows—to wit: ·

" I give to my uncle, *Walker Yarnall*, all my personal property, except as hereafter excepted.

" To *Elizabeth Black*, I give my bedsteads, bed and bedding, and every thing belonging thereto; also, three sheets or blankets and coverlids; these articles I give to the said *Elizabeth*, not as a compensation, but as a kind nurse, and desire that the said *Elizabeth* shall be well paid for her attendance and care besides.   To my aunt *Susan Hannum*, I give one crape shawl; also, to *Betsey Barton* one silk shawl,· being the same particularly designated by me for them in the presence of *Mary James* and *Elizabeth Black*.

(Case of Priscilla E. Yarnall's will.)

" To my aunt, *Sarah Meredith,* I give the remainder of the clothes formerly belonging to my mother; also, one bonnet box and two bonnets, which are now or formerly were in a cupboard in the room used by me at *Joseph Parry's.* And I request that my aunt, *Elizabeth Yarnall,* deliver these articles to the said *Sarah,* and I leave all my personal property, and dispose of the same as aforesaid, and desire *Mary James* and *Elizabeth Black,* to take notice and remember the same."

This paper was endorsed, " Paper offered to the Register's Court, as containing the nuncupative will of *Priscilla E. Yarnall, June* 15th, 1831."

It was filed in the Register's Court, on the day last mentioned.

On the hearing before the Register's Court, several witnesses were examined, whose depositions were reduced to writing, in pursuance of the act of assembly of 1705. To understand the case it is necessary that the substance of them should be stated.

*Mary James* testified that she was acquainted with *Priscilla E. Yarnall,* who died on the 27th day of the third month, 1831, at *Walker Yarnall's,* in *West-town* township. Before she went there, she had been at *Philip Price's* boarding school. She went to *Walker Yarnall's* house to make it her home. He was her father's brother. The witness was there several times during her last sickness. On the 17th day of the third month, on the fifth day of the week, she told the witness she had a good deal of property—some things to dispose of there—which she wished to leave to her uncle, *Walker Yarnall.* The witness staid all night, and on the 18th day, *Priscilla* asked her if she thought she could make a will. The witness told her she thought not, but she had better take advice, and perhaps she could give those things. She answered, that she wished to give all she had to her uncle *Walker,* except some articles which she wished her uncle, *Walker Yarnall,* to give to her half brother, *Robert Frazer, Betty Black,* and *Sarah Meredith.* A short time before her death, when there were several persons present, she declared that she wished these things divided as she had expressed herself, and that her uncle, *Walker Yarnall,* and *Elizabeth* his wife, had heard what she had said and knew all. *Walker Yarnall* was present on the 17th day, part of the time; he was present when she said she wished him to have all, with the exceptions specified. The last conversation, the witness thought was not more than half an hour before her death, but she was sensible to the very last. She mentioned both on the 17th and 18th, that she wished *Walker Yarnall* to have it all, but on the 18th no one was present, but the witness. *Elizabeth Black,* was passing and re-passing on the 18th; *Elizabeth Yarnall* was not present. On the 17th, she told the witness to remember that she wished her uncle *Walker* to have all her property. When she spoke of leaving her property to *Walker,* she used the words, all her personal property. *Elizabeth Black,* waited upon her during her last illness. The conversation above stated, which took place about half an hour before she died, was her last conversa-

tion.  She said she wished her uncle *Walker,* to give to *Robert Fra-
zer, Jr.* some silver spoons that were marked with his father's first
wife's name, and to *Elizabeth Black,* her bed and bedding, and all
things belonging thereto, adding, she did not wish that as a compen-
sation to *Betsey Black*; she wished her to be paid for her nursing.
She said there were some of her school books, which perhaps her
half brother would like to have, but she gave no charge to the wit-
ness.  She said she wished her aunt, *Sarah Meredith,* to have a
trunk and clothing that belonged to her (*Priscilla's*) mother.  She
gave to *Sarah Meredith,* a bonnet box and two bonnets, and said she
wished to divide her clothes among her aunts.  She wished her aunt
*Susanna Hannum* to have the crape shawl, and *Elizabeth Bartram*
to have a silk shawl.  She stated that her mother had made a will,
and had left what came to her, by her (*Priscilla's*) grandfather, *Jo-
seph Pennell,* to her half brother, *Robert Frazer;* her mother had
divided the personal property of her (*Priscilla's*) father, share and
share alike, between her and her brother *Robert.*  *Joseph Pennell,*
was the father of *Alice Frazer.*  She said that the farm in *Mid-
dletown,* which came from her father, *Eli Yarnall,* was left to her
mother during her natural life, and she got the rent.  She said she
did not wish to leave her half brother *Robert,* those things which the
witness specified;· she did not wish to give him her personal property.
This was said in the same hour in which she spoke of the manner in
which her mother had left her property.  The conversation occurred
on the ·18th.  It was on that day she wished the witness to remem-
ber how she had left her property.  At one time she said " disposed
of," and at another" left."   The witness thought *Priscilla* said, that she
should remember it both on the 17th and 18th.  *Priscilla* was turned
of eighteen years of age when she died.

On being cross examined by the counsel of the guardian of *Robert
Frazer,* she said, that *Priscilla E. Yarnall,* died of a pulmonary con-
sumption; the witness did not know how long she had been sick; her
uncle *Walker* brought her from school by her request.  She went to
her uncle *Robert Pennell's* soon after her mother's death, remained
there a little while, and then went to the boarding school.  There
might have been some dissatisfaction formerly between her mother's
family, and *Walker Yarnall,* but they were then in unity.  The wit-
ness did not know of any particular attachment between *Priscilla*
and her half brother, and did not know that she sent for him, but he
was there on the day of her death.  On the morning of the 17th,
when the witness was sent for, *Priscilla* was worse than she had
been, but when the witness arrived at the house, she was better.  On
the 17th, the witness thought that she would not live long.  She told
the witness, that she thought her time would not be long here.  On
the 17th, she sat up in her bed; she had not for several weeks sat up
much out of her bed.  On the 18th, she also sat up.  During the
conversation on the 17th, *Walker Yarnall* and his wife were in the
room; no one else.  On the 18th, no one was present but *Elizabeth*

*Black*, passing and repassing. The witness discouraged her from making a will in writing, because she thought she could not, and no writing was made either on the 17th or 18th, nor did she see any one write any thing on any day. *Walker Yarnall* took down what was said, but witness did not see him do so; he read it to her, and asked her if she could witness that; he read it to her after *Priscilla's* decease, several days before they went to the Register's office. The witness then identified the paper read to her, and proved that it was the paper first above mentioned as having been exhibited to the Register. She then added, that when *Walker Yarnall* shewed her the paper and asked her if she could testify to its containing the meaning and purport of what *Priscilla* had said, she answered, that it was the meaning and purport of what she had said; perhaps not the words exactly, but the substance. On the 17th, the witness stated, that if *Priscilla* had been urged to send for a scrivener, she supposed one would have been sent for, but the witness told her she must consult abler counsel; none was sent for. It was on the 18th that she spoke of drawing a will. If a scrivener had been there, she could have made a will on the 17th. On that day, the 17th, the witness thought she would not tarry, adding, that people in her state of health often go off very suddenly. On the 17th, *Priscilla* said she wished to dispose of all she had to *Walker Yarnall*, if she could make a will.

On being re-examined on behalf of *Walker Yarnall*, the witness stated that the uneasiness between *Alice Frazer* and *Walker Yarnall*, took place before *Priscilla* was born. There was no cause of uneasiness between *Priscilla* and her uncle *Walker*. The witness further stated that when she saw the paper, (the first mentioned paper) before they went to the Register's office, she informed *Walker Yarnall* that there was an error in it; the paper stated the declarations to have been made on the 18th and 19th; whereas, she had stated that they were made on the 17th and 18th.

*Susan Price*, another witness examined on the part of *Walker Yarnall*, stated that she was a teacher in the young ladies' boarding school, at which *Priscilla E. Yarnall* was placed. From her conversations, she believed that she intended to go to her uncle *Walker Yarnall's* to make it her home. Her time was not fully completed when she left school, but in consequence of delicate health, she went to her uncle *Walker's*, without intimating any intention of ever returning to school to remain as a pupil. She had been at school nearly six months before she left it.

The witness proved the hand writing of *Priscilla*, to the following note, the superscription of which, however, was not in her hand writing, but in that of her cousin, *Anna Pennell*, who was a pupil at the same school:—

" *Westchester*, 1st mo. 13th, 1831.

" Dear Uncle,

Thy non-arrival on third day has induced me to write a few lines, informing you that I shall be prepared to leave the

school on third day next. I should have written yesterday, had I not been from home, and in the evening I felt rather tired. If business should call thee into *Westchester*, on another day than 3d, thee need not subject thyself to inconvenience on my account, but thy calling sometime in the beginning of the week, will much oblige thy affectionate niece,

"*Priscilla E. Yarnall.*"

This letter was addressed to "*Walker Yarnall, West-town* township, *Chester* county, *Pennsylvania*," and was filed in the Register's office on the 15th day of *June*, 1831.

The witness further stated, that *Walker Yarnall* came to the school for her, and she believed paid for the last quarter; whether he paid for *Priscilla's* tuition or the amount of her extra expenses, she did not know. She stated also, that *Priscilla* was in delicate health when she came to the school, and her disease seemed to increase upon her very much. It was pulmonary consumption.

*Elizabeth Black*, who was also examined in support of the alleged nuncupative will, deposed, that she resided at *Walker Yarnall's* at the time the alleged testamentary declarations of *Priscilla E. Yarnall* were made, and that she had resided there ever since: That she waited on her day and night, from the time she came to *Walker's* house until she died: That on third day night about two weeks before she died, she told the witness that she wished her uncle *Walker* to have all her personal property that she could dispose of in any way: That the next fourth day night week, being the 16th of the third month, she again said the same thing, and told the witness further, that she wished her to have her bed and all belonging to it: That on sixth day, the 18th, in the evening, after the family had gone to tea, she told the witness that she had now settled all her worldly concerns; "she wished me to remember she had settled all her worldly concerns;" these were the words, "to her full satisfaction;" then after lying quiet a little while, she said she wished her uncle *Walker* to have all her personal property, and desired the witness to remember that it was to be so, the way she wished it, that it was her wish that it should be so; no one was present but the witness at that time: That on first day morning, the 27th, about half an hour before she died, she said to her aunt *Betsey, Walker's* wife, "thee'll give him them spoons," *them*, was the word: she then looked at the witness, and said, "thee knows what thee's to have, three blankets, three coverlids," and then she recollected they were bed quilts, "and aunt *Sally* them clothes and two bonnets and a bonnet box;" she then said "aunt *Betsey* knows and uncle *Walker* knows all about it, I have told them several times:" That these words were spoken about half an hour before her death; they were the last words she spoke, except to ask to be raised up once or so, and were just as she spoke them: That the witness never at any time, heard her speak of leaving any thing to her half brother, *Robert Frazer*; the morning before she died, she spoke about some spoons, but did not mention any name: That

the clothes which had belonged to her mother, were in a trunk kept in the garret, and on the 18th, she wished those clothes brought to her; she then laid out a shawl for her aunt *Susan Hannum*, and another for *Betsey Bartram;* one was a silk shawl, the other a crape one, the rest of the clothes she said were all for her aunt *Sally Meredith;* she did not then say any thing about 'the bonnet box and bonnet; she mentioned them on first day morning; the bonnets and bonnet box were kept in a cupboard, in her room at *Joseph Parry's:* That the witness was backwards and forwards in the room (in which *Priscilla* died) on the 18th, when *Mary James* was there, and heard some conversation take place then; she told *Mary James,* that she wished her uncle *Walker* to have her property, and mentioned some things; she mentioned to *Mary James,* about her clock; she wished her uncle *Walker* to have that: That the witness did not recollect any thing else at the time when *Mary James* was there: That so far as the witness knew, *Alice Frazer* and *Walker Yarnall,* were good friends, visited backward and forwards, and were sociable and friendly: That *Priscilla* told her, when she came to *Walker Yarnall's,* that she intended making it her home; her uncle felt nearer to her than any one else; more like a father; she had never known what it was to have a father's house to be at: That the witness recollected *John Frazer* being there on seventh day, the 19th of the third month; he was there all night and went away on first day morning: That she requested that either *Betsey Yarnall* or the witness, should stay in the room when he was there: That *Ann Barton, John Frazer's* sister was there: That on fourth day, *Priscilla* said she talked a great deal to her; worried her; she was worried very much; she was weak and could not bear it; she wished them (Mrs. *Yarnall* and herself), to stay in when *John* was there and talk to him, instead of her answering questions; *John* was there only once: That on seventh day, *Priscilla* gave *John* ten dollars, and told him it was for *Robert,* in place of a watch; she wished her uncle to have the watch and *Robert* the money in place of it; the watch had been her father's: That *Priscilla* told *John* that she had given her personal property to her uncle *Walker;* this was said at the time she spoke of the watch, and *John* said, "*Priscilla,* thee's too weak to worry thyself about these things; if thee should not get well, there will be a way to settle all these things." *Priscilla* then said, that *Robert'* wanted the watch, and she was not willing he should have it; she was not willing it should go out of the name.

On her cross examination, the witness said, That she was not a relation of *Walker Yarnall,* but had resided with him about fourteen years: That she could not tell exactly how long *Priscilla* had been sick, but she thought about nine or ten weeks: That she came to *Walker Yarnall's* the fifth day next after the deep snow, and had never been there before to make it her home; before she went to school she had lived with her mother in *Middletown,* on the place that had been her (*Priscilla's*) father's; she lived with her mother

until her death, which occurred early in the spring: That she died of a consumption; she was very weak and thought she would never get well: That some of the goods she gave to *Walker Yarnall,* were at her uncle's; there were a few chairs there at the time of her death, an old bureau, bed, bedding and bedsteads and a few clothes; the witness could not tell where the rest of the goods were: That the paper first mentioned, as having been offered for probate, was in *Walker Yarnall's* hand writing, but the witness did not know when he wrote it; she saw it first a day or two before they went up to the Register's office, and on that day also: That after the death of *Priscilla,* he never spoke to the witness on the subject of what she had said; he only asked if she would be willing to witnesss the paper; to which she replied, that she would, for it was pretty much what she had told her: That she had not seen the paper since she was at the Register's office, until it was shewn to her on her examination, nor had she had any conversation with *Walker Yarnall* or his family, of any account since she was at the Register's office: That on the 18th, when *Mary James* was with *Priscilla,* the witness was occupied about many things; she was waiting on *Priscilla* several times, and was out of the room sometimes about the affairs of the house: That *Robert Frazer,* she supposed was turned of eighteen; *Priscilla* never sent for him to her knowledge, and she never heard her say a word about sending for him, nor heard one of the family say she had mentioned any thing of the kind: That the witness was in the room when she received him on his first arrival; she seemed pleased to see him; spoke to him, but nothing more; *Robert Frazer* was her half brother and the only brother she had: That he came on the 19th of *March,* and staid until after she was buried, which was on the 29th of that month; whether he staid at *Priscilla's* request, she did not know; the witness believed she asked *John Frazer,* in the presence of *Priscilla,* whether *Robert* was going to stay, to which he answered, that he was going to leave *Robert,* and *Priscilla* said, very well: That *Walker Yarnall* had no children; she could not tell whether he was a man of considerable property or not; he had a place, and there was always plenty to eat.

*Margaret Parry,* who was also produced and examined as a witness on behalf of *Walker Yarnall,* testified that *Priscilla* had told her a year ago the preceding spring, that she meant to make her home at *Walker Yarnall's.* She said she felt dissatisfied about her mother's will; all the money which her grandfather *Pennell* had left her mother, she had willed to little *Bobby,* (*Robert Frazer, Junr.*) and the remainder of her property was to be divided between herself (*Priscilla*) and him. This witness proved some other matters which need not be repeated.

*Isaac Thomas,* who attended *Priscilla E. Yarnall,* as a physician during her last illness, was also examined on behalf of *Walker Yarnall,* but his evidence is not material.

*Henry Myers* was then produced and examined on the part of

those who opposed the probate of the alleged nuncupative will. The only part of his evidence at all material was, that he was the guardian of *Robert Frazer, Junr.* and having met *Walker Yarnall* near his own house a day or two after the funeral of *Priscilla E. Yarnall, Walker,* in answer to a question put by the witness, informed him that some part of the effects which had been allotted to *Priscilla* on a division of the property of *Alice Frazer,* were then at his house, and that *Priscilla* had given them to him with a request that he would deliver certain articles to different individuals among her friends. The witness enquired of him whether she had made any disposition of them in writing, to which he answered, that she had not. *Walker Yarnall* at that time intimated no intention of setting up a nuncupative will, and when he mentioned what she had given to him, he said nothing about moneys or all her personal property. A few days after, he served a citation on the witness, as the guardian of *Robert Frazer,* to appear at the Register's office of *Chester* county. The witness said he knew there were moneys in the hands of the executor of *Alice Frazer,* belonging to *Priscilla E. Yarnall,* and that some of it had been taken out of his hands, as the witness thought, improperly. The amount which he supposed would be the portion of *Priscilla* was between seven and eight hundred dollars.

*John F. Frazer,* a half brother of *Robert,* was likewise examined in opposition to the alleged will. The tendency of his evidence was principally to shew the affection *Priscilla* entertained for *Robert,* and that at her request, he had been brought from school, at *Pittsfield, Massachusetts,* to see her during her last illness.

*Ann Barton,* a half sister of *Robert Frazer, Junr.* who was examined on the same side, likewise gave evidence tending to shew the attachment of the deceased to her brother *Robert,* and further stated, among other things, that she was at *Walker Yarnall's* on the *Wednesday* preceding the 19th of *March,* on a visit to *Priscilla.* On that day, after enquiring about the progress of *Robert* at school, whether his income was sufficient to defray the expenses of his education, &c. she said she believed her property went to Mr. *Yarnall* and her two cousins, *Thomazine Pennell* and *Priscilla Wells.* The witness replied that it certainly did, but said, if you have any thing to give, give it to him, for his situation is so different from that of both the other branches of the family that he may feel it. *Priscilla* evinced great feeling on the occasion, and asked if she could make a will. The witness told her she did not know, but thought she could, and advised her to ask Mr. *Myers* who would be up the next day. She then expressed a wish to see him, hoped he would come and said she wished to leave *Robert* all she could give him, adding she wished she could give him more, he was nearer to her than any one else, but her father's property was willed away. She also expressed a wish to see Dr. *Barton,* as well as Mr. *Myers,* not professionally, as the witness thought, but about her affairs.

In conclusion, the counsel of *Walker Yarnall,* examined as a wit-

ness to support the alleged will, *Joseph Parry*, who testified that he lived on a farm belonging to *Priscilla E. Yarnall*, and that she had told him to mind what her uncle *Yarnall* said to him respecting the place, and not any body else—if any one else was displeased, not to mind that; if he only pleased him, he would please her, for she wished him to do all her business, although she had a guardian.   She then told the witness she thought she had not been well treated by her mother in her will; all the money she had got by her (*Priscilla's*) grandfather, she had given to little *Bobby*, and full half the money she had given to him, she had made on her (*Priscilla's*) place ; adding, that she thought the *Frazer* family had got pretty well of her place and her already, and she thought they were about done ever getting any more.

The cause was argued in this court by *Dillingham* and *Chauncey* for the appellant, and by *Bell*, for the appellee.

*Arguments for the appellant:*—The contending parties are, on the one hand, an uncle of the testatrix, on the paternal side, from which the property came, and on the other, a maternal half brother, who besides his share of his father's estate, has already received a considerable portion of the estate which came from her father.   The whole tenor of the evidence, shews a decided aversion on her part to the claims of her brother's family, and her attachment to her maternal uncle, as well as her sense of the justice of his succeeding to the property which she derived from her father.   After leaving school, she went to his house as her home.   She left school about the middle of *January*, 1831, and about three weeks afterwards, was placed under the care of a physician, who pronounced her case desperate. After having been confined to her bed and given up all hopes of recovery, she made the nuncupative will offered for probate.   That *Walker Yarnall's* house was her *home*, and that it was her intention to dispose of her property in his favour, are facts which the evidence places beyond a doubt.   On the 15th of *March*, according to the testimony of *Elizabeth Black*, she expressed a wish to give to him all her personal property.   On the 16th, she was visited by Mrs. *Barton*, the half sister of *Robert Frazer*, *Junr.* who urged her to make a will in his favour.   On the 17th, she enquired of *Mary James* whether she could make a will, and repeated her desire to leave all her personal property to *Walker Yarnall; Mary James* dissuaded her from making a will, but suggested a substitute.   On the 18th, she said she wished to give all she had to her uncle *Walker*, with certain exceptions, and requested *Mary James* to remember it.   *Elizabeth Black* was passing and repassing during the conversation, and heard her say this to *Mary James*, and afterwards, she too, was requested by *Priscilla* to remember it.

The question then is, were these words thus proved by two witnesses, spoken by the deceased as testamentary?   To determine this question, it will be necessary to enquire into the meaning of the

terms will and testament. In several cases they are indiscriminately used, and signify "the testifying or declaring of the mind." The *animus disponendi*, is the only essential particular. *Swinb. on Wills,* 2, 3. 12, 13. See also, 7 *Ba. Ab.* (*Wils. Ed.*) 299, 300. *Wills and Testaments, A.* 2 *Bl. Com.* 499. A nuncupative will is synonimous with a verbal will, *Swinb.* 51. What is chiefly required to constitute such a will is, that the testator should name his executor, and declare his mind by word of mouth, without writing before witnesses; no precise form of words is required, *Swinb.* 336. Here the deceased did declare her mind plainly by word of mouth, before witnesses, as to the disposal of her property after her death.

The objections made in the court below to the validity of the alleged will, were—1. That the witnesses were not at the same time requested to take notice that what she declared was her will,—2. That her declarations were not made in *articulo mortis.* The act of assembly of 1705, sec. 3. *Pur'd. Dig.* 876, which is modelled after the *Stat.* 29 *Ch.* 2. *c.* 3. *s.* 19, requires that a nuncupative will shall be proved by two witnesses, who were present at the making thereof, and that it shall be proved that the testator at the time of pronouncing the same, did bid the persons present, *or some of them,* to bear witness that such was his will, *or to that effect.* It further requires that such nuncupative will, be made in the time of the last sickness of the deceased. The *rogatio testium,* was in this case complete. Two witnesses, *Mary James* and *Elizabeth Black* were present on the 18th, when the *testatio mentis* was made; both prove the testamentary words spoken at the same time, and *Mary James* testifies that she at the same time, bade her remember how she had left or disposed of her property, which is to *the same effect,* as requesting her to bear witness that such was her will. Thus the terms of the act were literally complied with. But it does not require that both the witnesses should be requested to bear witness at the same time, nor that their attestation should be simultaneous. No case has decided that this is necessary, and it is not analogous to what is required in the case of written wills. Ever since that statute of wills, it has been decided both in *England* and this country, that the attestation of the witnesses need not be simultaneous. 1 *Roberts on Wills,* 131. *Cook* v. *Parsons, Prec. in Ch.* 185. *Jones* v. *Lake,* 2 *Atk.* 176. This directly contradicts the provisions of the civil law which requires the publication or solemnization of the will to be *uno actus contextu,* that it should be signed, published and attested, *simul et semel,* 1 *Roberts on Wills,* 131, *note* 2. *Id.* 136, *note* 6. See also *Swinb. part* 4, *sec.* 26, 27. The policy of the civil law in respect to wills, was in all respects more strict than that of the common and statute law of *England,* and in *Pennsylvania,* it is still less strict than in *England.* Form and solemnity as to wills are now dispensed with, and if the *animus testandi,* be fully proved, it is enough. A mere endorsement on a note, "I give this note to *A.,*" may be proved as a will. 7 *Ba. Ab.* 301. *Wills, A.* In *Pennsylvania,* it is not necessary that a will

(Case of Priscilla E. Yarnall's will.)

should be signed, sealed, witnessed or published, or that it should be in the hand writing of the testator.　*Hight* v. *Wilson,* 1 *Dall.* 94, *Rossetter* v. *Simmons,* 6 *Serg. & Rawle,* 452.

Assuming that the *testatio mentis,* has been proved by the requisite number of witnesses, the next step towards the establishment of the alleged nuncupative will in question, is to shew that it was made " in the time of the last sickness of the deceased."　Is it meant that the person making testamentary declarations, must be *in extremis?* The construction put upon the words of the act by the court below, is artificial and constrained, and was adopted in submission to the opinion of Chancellor KENT, in the case of *Prince* v. *Hazelton,* 20 *Johns. R.* 502, in which he was misled by his feelings and prejudices, and misled with him a majority of the Court of Errors of *New York.* The facts of the present case in relation to this point are, that the deceased, on the 18th of *March,* made her will, and died on the 27th of the same month.　Her case had been previously pronounced by her physician hopeless.　Her friends were aware of her situation, and she was fully aware of it herself.　To no one did she express an expectation that she should recover after the 15th of *March.*　Her will was thus made emphatically in the time of her last sickness, and made " for fear that death or want of memory or speech should surprise her, that she should be prevented if she staid the writing of her testament; wherefore, she desired her friends and neighbours to bear witness of her will, and declared the same presently before them."　7 *Ba. Ab.* 305, *Wills and Testaments, D.*　The words of the act, " in the time of the last sickness," are so remarkable as to contradict, by any fair reasoning, the construction put upon them.　There are three things to be observed in regard to the case of *Prince* v. *Hazelton* which tend greatly to weaken its authority.　1. It is a leading case unsupported by a single precedent since the statute of *Charles* II. 2. It utterly fails in the attempt to find a technical meaning for the words of the act in the definitions and descriptions of nuncupative wills by elementary writers.　3. It proceeds in part upon the erroneous assumption of a similar principle in the case of a *donatio causa mortis,* and abounds in false reasoning.　It is to be observed likewise that Judge SPENCER assigns special reasons for his opinion, which are not applicable to the present case, and Judge WOODWORTH dissents *totis viribus.* That case can only be considered as a precedent, for such as are exactly analogous to it.　Before giving his opinion on the law, the Chancellor had come to the conclusion " that the will was evidently the production of fraud and perjury," in which Judge PLATT agreed with him.　" It was made in the middle of the day, when the alleged testator was quite comfortable and far from the apprehension of death."　Even the correctness of the Chancellor's definition of a *donatio causa mortis,* may be questioned.　That it can only be tolerated when the party making it is *in extremis,* has been held by many not to be good law.　1 *Roberts on Wills,* 10, *note.*　SPENCER'S opinion is expressly founded upon this reason, " that it appeared from all the

evidence in the case, that when the alleged will was made, he did not think himself, nor did any other person think him to be in any immediate danger of dying, and there was ample opportunity to make a will in writing." In the case of *Priscilla E. Yarnall,* the reverse of this was the truth. Besides, her will was actually published again on the 27th of *March,* only half an hour before she died. *Mary James* and *Elizabeth Black,* both say that she called the attention of all present to the manner in which she had disposed of her property. The very words, "I bid you to bear witness that such is my will," may not have been used, but the manner in which she repeated her intentions to all present, in connection with her last words, must be considered as equivalent to an express request to take notice of her will. She positively and distinctly referred to her will at this time, in the presence of two persons who had previously heard her declare it, and thus with her last words requested them to take notice of it.

The counsel for the appellant, besides the authorities already referred to, cited *Perkins, sec.* 467. *Swinb. part* 1. *sec.* 12. 6 *Wood,* 574, *Orph. Leg. sec.* 12, 13.

*Arguments for the appellee.*—The alleged will is bad,—
1. Because it is not proved by the requisite number of witnesses.
2. Because it was not made during the last sickness of the deceased.
3. Because the witnesses do not agree as to what the will is.
4. Because the *animus testandi* does not sufficiently appear.

1. Nuncupative wills were known to the common law prior to the statute 32 *Hen.* 8. During the unlettered ages they were of frequent occurrence, and it would seem, from subsequent enactments, gave rise to numerous frauds and perjuries. It was to correct this evil as far as possible, that the *Statute of Frauds and Perjuries* was enacted. *St.* 29, *Ch.* 2. 6. 3. 7 *Ba. Ab.* 337. 2 *Bl. Com.* 500. From this statute our act of assembly of 1705, was copied, almost literally, except that it is satisfied with two witnesses, while the *English* statute requires three, (See 2 *Phillimore,* 191. 194.) In both these acts, the following provision is to be found, *viz.:* " that no nuncupative will shall be good," &c. " that is not proved by two or more witnesses, who were present at the making thereof, nor unless it be proved, that the testator, at the time of pronouncing the same, did bid the persons present or some of them, bear witness, that such was his will," &c. Two witnesses at least, must be present at the time the alleged will was made, and in this respect only our act differs from the *English* statute which requires three. The words of the act are so clear as not to require the aid of authority to give them a construction, nevertheless as this position was combatted in the court below, it may be proper to cite some authorities in support of it. It is not enough if one witness hear the will at one time, and another at another time. The witnesses must all be present together at the time the testamentary declarations are made. Dr. *Chalmer's Case,* 7 *Ba. Ab.* 339.    1

(Case of Priscilla E. Yarnall's will.)

*Eq. Ca. Ab.* 403, 404. The position that the witnesses need not be present at the same time, derives no support from a supposed analogy between nuncupative and written wills. They are essentially different. In the case of a will of lands, the statute does not require the testator to sign the instrument in the presence of the witnesses. 7 *Ba. Ab.* 306. 308. 1 *Eq. Ca. Ab. A.* 403. But our act of assembly expressly requires, that a nuncupative will shall be declared in the presence of the witnesses, and that the testator should bid the persons present, or some of them, take notice. On no occasion were testamentary declarations made by *Priscilla E. Yarnall,* in the presence of two witnesses at one time. They were not made in the conversation proved by *Elizabeth Black* two weeks before her death, when she said she wished her uncle *Yarnall* to have all the personal property she could dispose of. They were made in the presence of only one witness, and it is not pretended that they constitute the will. Nor were such declarations made on the night of the 16th of *March,* when, according to *Elizabeth Black,* she repeated what she had·said before, and added that she wished the witness to have her bed, &c. This conversation is liable to the same objection as the preceding one; nor could the alleged will have been made on the 17th, when she told *Mary James* that she had property *there* which she wished *Walker Yarnall* to have. Only one witness was present on that occasion. That these conversations were not intended as testamentary dispositions is evident from her asking *Mary James,* on the 18th, if she thought she could make a will. Aware of the difficulty he has to encounter, the appellant, in one of the papers filed, has taken the 18th and 19th, and in the other the 17th and 18th, as the days on which the will was made, and by tacking together loose conversations, no two of which agree, he attempts to make out a testamentary disposition. If such a disposition was not made on the 18th of *March,* 1831, it was not made at all. On that day there were two conversations; one during the day with *Mary James;* the other at night with *Elizabeth Black,* and although *Elizabeth Black* says she heard some part of the conversation addressed to *Mary James,* yet she heard it only in detached parts as she was passing backwards and forwards at the time and engaged in various matters about the house. At the conversation on the evening of the 18th, with *Elizabeth Black,* no one was present but *Priscilla* and herself; up to this time, then, no two witnesses were present at any one conversation. But it is said that on the 27th of *March,* there were two witnesses present at what is called a re-publication of the will. A re-publication only takes place where the will has been revoked by act of law or of the party, 7 *Ba. Ab.* 320. There can be no re-publication of a nuncupative will except by a repetition of all the words and formalities necessary to make the will itself. To say that in the present instance, a re-publication took place, is to make a will by reference to that which never had any existence as a will. And what was said on the 27th, cannot be set up as a will, standing by itself, because testamentary

words are wanting. 1 *Eq. Ca. Ab.* 403.   *Ba. Ab.* 338, 339.   Instead of appealing to the witnesses, and calling on them to take notice of her will, she refers to the legatee and his wife as knowing the dispositions she had made of her property, which proves that *Mary James* and *Elizabeth Black* were not considered by her as witnesses to her will. How could they know what she had said to *Walker Yarnall* and his wife? Another fatal objection to the alleged will is, that the witnesses do not agree even in substance, as to the alleged testamentary declarations, and there is a material difference between the dispositions said to have been made on the 17th, and those said to have been made on the 18th.   (The counsel here referred to the evidence in support of his allegations.)   The reason why the law requires the presence of more than one witness is to guard, as far as possible, against the frailty of human memory, and this case affords a singular illustration of the wisdom of its provisions.

2. The alleged will was not made in the last sickness of the deceased.   A nuncupative will, prior to statute 29th *Ch.* 2, is described to be a will by word of mouth, made lest death should overtake the testator, if he should wait until it is reduced to writing.   7 *Ba. Ab.* 305.   *Swinb. part* 1, *sec.* 12, *page* 58.   *Part* 7, *sec.* 12, *page* 520.   To be effectual, it must be made *in extremis.*   The only instance in which favour is shewn to such a disposition of property, is when the testator is surprised by sudden and violent sickness, 2 *Bl. Com.* 500, 501.   It may be doubted whether nuncupation is allowable in any case of lingering disease, where, while the party is warned of approaching dissolution, time is given for preparation.   This construction has been given to the *New York* statute on this subject, which is similar to ours.   In the case of *Prince* v. *Hazelton*, 20 *Johns.* 502, in which all the authorities are collected, and the subject fully considered, the alleged testator had been sick six weeks.   The alleged will was made on the 11th of *April*, 1820, and the testator died on the 17th of the same month, six days after, and the will was not admitted to probate.   The disease of *Priscilla E. Yarnall*, was of a lingering character, a pulmonary consumption.   She had been confined nine or ten weeks, during the greater part of which, she was perfectly capable of making a will.   Until a very late period of her life, she did not despair of recovery. The alleged will was made on the 18th, and she did not die until the 27th of *March.*   On the 18th she was certainly not *in extremis*, and if she really wished to make a testamentary disposition of her property, there was nothing to prevent her doing it in writing.

3. The proof differs as to what the alleged will really was, supposing the other difficulties to be out of the way.   (The evidence was here examined and commented on by the counsel, and the alleged inconsistencies in it pointed out.)

4. The *animus testandi* does not sufficiently appear.   The intention to bequeath, must be distinctly shewn.   Loose words are not sufficient.   2 *Bl. Com.* 501.   *Swinb. part* 7, *section* 13, *page* 520, 521.

(Case of Priscilla E. Yarnall's will.)

On the 16th of *March*, she consulted Mrs. *Barton*, about her power to make a will.　On the 18th she consulted *Mary James*, who thought she could not make one.　She wished to see Dr. *Barton* and Mr. *Myers* on the subject of her affairs, and on the 18th, she expressed a *wish* to give, &c.　With these doubts on her mind, it is impossible she could have supposed she was making a complete testament, when the conversations took place, which have been given in evidence.　If she knew what a nuncupative will was, and thought she had made one, and had called on witnesses to attest it, she would not on the 27th have referred to *Walker Yarnall* and his wife as the depositories of her views in relation to her property.　If she intended to dispose of any thing, she intended to make a *donatio causa mortis* of the articles in the house, and this was incomplete for want of delivery.　It is impossible she could have intended to give her whole estate to her uncle.　He was wealthy and without children, and did not stand in need of it; while her brother *Robert*, though a member of an opulent family, was poor.　She was attached to him, said he was nearer to her than any one else, had him sent for from school in *Pittsfield, Massachusetts*, manifested a warm interest in his welfare, and a desire to leave him all that she had in her power, and regretted that her father's property was placed beyond her control.　Can it then be believed that she intended to deprive him of all she had it in her power to dispose of?　None of the witnesses speak of her having given to *Walker Yarnall* her money. It is mentioned no where but in the paper drawn up by himself.　To *Mary James* she said, she had some things to dispose of *there*, that is at *Walker Yarnall's*, which she wished him to have.　She may have intended to make a disposition of those articles in his favour, but if she did, it could not take effect either as a nuncupative will, or as a *donatio causa mortis*, for the reasons already given.　As to any thing else, no *animus testandi* appears.

The opinion of the court was delivered by

Rogers, J.—The papers purporting to be the nuncupative will of *Priscilla E. Yarnall*, are opposed on four grounds:—

1. They are not proved by the requisite number of witnesses.　2. There is an absence of the *animus testandi*.　3. Because the witnesses do not agree as to what the will is.　And, 4. That the will was not made in the time of the last sickness of the deceased.

The act of 1705, (which is in no respect different from the statute 29 *Charles*, except in the number of witnesses which is required) enacts, that no nuncupative will shall be good, where the estate thereby bequeathed, shall exceed the value of thirty pounds, that is not proved by two or more witnesses who were present at the making thereof, nor unless it be proved that the testator, at the time of pronouncing the same, did bid the persons present, or some of them, bear witness, that such was his will, or to that effect; nor unless such nuncupative will, be made in the time of the last sickness of

(Case of Priscilla E. Yarnall's will.)

the deceased, and in the house of his, or her habitation or dwelling, or where he or she hath been resident for the space of ten days or more, next before the making of such will, except when such person was surprised or taken sick, being from his own house, and died before he returned to the place of his or her dwelling.

Nuncupative wills, though tolerated, are by no means favourites of the law.

Sir *William Blackstone* observes, that the legislature has provided against frauds in setting up nuncupative wills, by so numerous a train of requisites, that the thing itself has fallen into disuse; and it is hardly ever heard of, but in the only instance where favour ought to be shewn to it, when the testator is surprised by sudden and violent sickness. The testamentary words must be spoken with intent to bequeath; and as the same learned writer observes, not in any loose idle discourse; for he must require the by-standers to bear witness of such his intention. The will must be made at home or among his family or friends, unless by unavoidable accident, to prevent impositions by strangers. It must be in his last sickness; for if he recovers he may alter his dispositions, and has time to make a written will. It must not be proved at too long a distance from the testator's death, lest the words should escape the memory of the witnesses; nor yet too hastily and without notice, lest the family of the testator should be put to inconvenience or surprise. Much more is requisite to the due proof of a nuncupative will, than a written one. Numerous restrictions, (as we have just seen,) are imposed upon such wills, the provisions of which must be strictly complied with, to entitle a nuncupative will to probate. The absence of due proof of strict compliance with any one of these is fatal. *Bennett* v. *Jackson*, 2 *Phill.* 190. *Parsons* v. *Miller*, 2 *Phill.* 194. So also, the *factum* of a nuncupative will requires to be proved by evidence more strict than that of a written one, in every single particular. This is requisite in consideration of the facilities, with which frauds in setting up nuncupative wills are obviously attended; facilities which absolutely require to be counteracted by courts insisting on the strictest proof, as to the fact of such alleged will. Hence the testamentary capacity of the deceased, and the *animus testandi*, at the time of the alleged nuncupation, must appear in the case of a nuncupative will, by the clearest and most indisputable testimony. Above all, it must plainly result from the evidence, that the instrument propounded contains the true substance and import, at least, of the alleged nuncupation; and consequently that it embodies the deceased's real testamentary intentions, though not so reduced to writing during his or her life, as to be capable of being propounded as a written will; for unless the court is morally certain, by pronouncing for it, of carrying them, and no other into effect, it is obviously its duty, not to give any alleged will, much less a nuncupative one, the sanction of its probate.

The words of the act are, that no nuncupative will shall be good,

(Case of Priscilla E. Yarnall's will.)

where the estate bequeathed, shall exceed the value of thirty pounds, that is not proved by two or more witnesses, who were present at the making thereof, nor unless it be proved, that the testator at the time of pronouncing the same, did bid the persons present, or some of them, bear witness that such was his will, or to that effect.

It must be observed, that there is a marked difference, as regards the attestation, between a written and nuncupative will, the legislature having placed many guards on the latter, which were unnecessary on the former. A written will may be reduced to writing at one time, and attested by the witnesses, at different times. Not so as we conceive in the case of a nuncupative will, which more nearly resembles the formula observed in the civil law. In the Roman jurisprudence, it was held, that a testament ought to be made *uno contextu*, without any foreign act intervening, and the witnesses were likewise required to attest without separating, or even discontinuing the act of subscribing, till all was complete. The legislature, in the act of 1705, evidently looked to the nuncupation, as an evil, and it will not do for the testator to declare his will first in the presence of one witness, and afterwards in the presence of another witness. As in the Roman law, it does not seem that the witnesses were even released from the necessity of subscribing at one time, and in each other's presence, so we think that the requisite number of witnesses must be present, and called on to attest at the same time, of the alleged nuncupation. The act says, the will must be proved by two or more witnesses who were present at the making thereof. We are further of the opinion, that the *rogatio testium*, the calling on persons to bear witness to the act, must also be done at the time of the nuncupation, and that this must be proved by two or more witnesses, who were present at the time. I cannot conceive, why inferior proof should suffice. It is an important part of the nuncupation, and goes far to shew the *animus testandi* of the deceased, and for this purpose it was that the act requires that the testator should call on the witnesses to remember that such was his will. The act says, the will shall not be good, unless the testator, at the time of pronouncing the same, did bid the persons present or some of them, bear witness that such was his will, or to that effect.

The legislature go upon the supposition, that more than two may be present, who may be called on to bear witness to the publication of his will, or that the testator may bid some of them, (not some one of them,) to bear witness that such is his will. We think this construction necessary, as a guard against fraud, to which nuncupations are particularly exposed. 1 cheerfully admit, that the act does not require any particular words for a *rogatio testium*. It is certainly sufficient if the court is satisfied, that the deceased meant to do a testamentary act, and wished the persons to attest, but I cannot agree, that if he desired only one to attest it, that satisfies the requisition of the statute. Still less can I suppose, that the *rogatio testium* to different witnesses at different times, would fulfil its requirements.

(Case of Priscilla E. Yarnall's will.)

Test this case, by these principles, and the court is clearly bound to say, that this will has not been proved according to the act, and should not be admitted to probate.

Without insisting on the point, that there were not two witnesses to the whole will present on the 18th, the time of the alleged nuncupation, it is perfectly certain there is an absence of the requisite proof of the *rogatio testium*, at that time. *Mary James* says, that *Priscilla E. Yarnall*, mentioned both on the 17th and 18th, that she wished *Walker Yarnall* to have all her property, but that on the 18th no one was present but herself. *Elizabeth Black* was passing and repassing on the 18th. She says that the testatrix told her to remember that she wished her uncle *Walker* to have all her property. This was on the 18th. She says she is satisfied she told her to remember it; and this both on the 17th and 18th, she thinks. On the 17th and 18th, there is no other person who proves the *rogatio testium,* for although *Elizabeth Black* was passing and repassing on the 18th, she does not pretend to say that the testatrix called on her at that time, to bear witness that such was her will. *Elizabeth Black* testifies, that on sixth day, in the evening, after the family went to tea, she told her she had now settled all her worldly concerns, to her full satisfaction, and this she wished her to remember ; that she wished her uncle *Walker* to have all her personal property. But she adds, no one was present but her at that time. She in no place proves that at the time of which *Mary James* speaks, she was bid to remember the dispositions the testatrix made of her property.

Independently also of the want of the *rogatio testium*, there is great doubt whether there was that *animus testandi*, which the statute requires. I do not know that any form of words is required, but it is clear that the testamentary capacity of the deceased, and the *animus testandi*, at the time of the alleged nuncupation, must appear in the case of a nuncupative will, by the clearest and most indisputable testimony. *Bennett* v. *Jackson*, 2 *Phillimore*, 193. *Leman* v. *Bonsal, Adams's R.* 389.

It is by no means certain that the alleged testatrix was aware that she had the power to make a will. She asked *Mary James* on the 18th, whether she thought she could make a will, who told her she thought not, but she had better take advice, and told her that perhaps she could give those things. She told witness that she had a good deal of property, some things to dispose of *there*, which she wished to leave to her uncle *Walker Yarnall.* This was on the day of the alleged nuncupation. Afterwards, (I infer it to be so,) she asked *Ann Barton* if she could make a will. She told her, she did not know, but thought she could, that she should ask Mr. *Myers*, who would be up the next day. She then expressed a wish to see him, hoped he would come, and said she wished to leave her brother *Robert* all she had. Whether she ever consulted Mr. *Myers*, does not appear, but from this it is evident that at that time, she had no idea she had made a disposition of her property by will. Nor is it very clear that she ever

(Case of Priscilla E. Yarnall's will.)

intended her uncle *Walker* to have any property except such as was then at his house.   The expressions to *Mary James*, are very peculiar. She said she had a good deal of property, some things to dispose of *there*, which she wished to leave to her uncle *Walker Yarnall*.   It is very doubtful, whether it ever entered her mind, to dispose of the moneys which belonged to her, and which her uncle has been so careful to insert in his statement of the will.   It is passing strange, if the testatrix had an idea that she could make a will, that the will was not reduced to writing.

These views would be sufficient to prevent the will being admitted to probate; but there is one other point, on which we think it right to express an opinion.   Was this nuncupation in the time of the last sickness of the deceased, and coupled with this, does it possess the other requisites to entitle it to probate?   The prominent facts, as connected with this part of the case are these. *Priscilla E. Yarnall* was a minor, of the age of eighteen years, who had been afflicted with a pulmonary consumption for about six months, of which she died on the 27th of *March*, 1831.   The will was made on the 18th, nine days before her death.   Although weak in body, she retained the possession of all her faculties until the last hour of her life.   Can a will, made under such circumstances, be entitled to probate, as a nuncupative will?

This point has been deliberately examined in the Court of Errors in *New York*, (where they have a similar statute,) in the case of *Prince, Public admr. in the City of New York, Appellant* v. *Hazelton and Wife*, 20 *Johns. R.* 503.   Chancellor KENT, who has examined the case with great care, and whose views we adopt, has come to the conclusion, that a nuncupative will is not good, unless it be made by the testator, when he is *in extremis*, or overtaken by sudden and violent sickness, and has not time or opportunity to make a written will. I have examined the authorities on which the Chancellor relies, and although the opinions of some of the elementary writers are stated rather more strongly than there is any warrant for, yet, on the whole, the Chancellor undoubtedly is sustained by authority, in the general view he has taken on the reason of the rule, as applied to the construction of the statute.   The Chief Justice of *Connecticut* also says, " Nuncupative wills are allowed only when *in extremis* and dangerous sickness, the testator has neither time nor opportunity to make a written will, and sincerely and deliberately declares his intention respecting the disposition of his estate before a number of witnesses called for that purpose." 1 *Swift's System*, 420.   Unless we give the statute this construction, we must give effect to every disposition made at any time, however protracted the disease may be, and whatsoever opportunities there may have been to make a written will.   The inconvenience of such a construction is strongly shewn in the opinion of the Chancellor, to which I have referred.   *Priscilla E. Yarnall* can, with no propriety be said to have been *in extremis* at the time of the alleged nuncupation.   There was nothing to pre-

vent her making a written will. Although fully impressed with the nature of her disease, she does not appear to have lost all hope of life. On the contrary, she speaks of her recovery, and her subsequent plans. She lived nine days after speaking the pretended testamentary words, with the full possession of all her faculties up to the moment of her death.

It is unnecessary to examine the testimony in respect to the other point made by the appellees. It is conceded that the witnesses must agree as to the testamentary disposition. Unless the court is morally certain of carrying the will of the deceased, and no other, into effect, it is obviously its duty not to give the will the sanction of its probate.

In conclusion, I have to remark, that there was an obvious impropriety in the principal devisee reducing the nuncupative will to writing. And this is shewn in the case itself, by his inserting a word, which he supposed made for him, not used by the testatrix, at least not proved by the testimony of any of the witnesses.

Decree of the Circuit Court affirmed.