## BRUNSON et al. v. BURNETT et al.

1. ADMINISTRATION—EFFECT OF GRANT OF LETTERS.—It is irregular for a judge of probate to grant letters of administration on an intestate's estate to persons not the next of kin, until after the statutory period shall have elapsed after the intestate's demise. The acts of parties thus irregularly appointed cannot legalize the appointment, nor estop or prevent the officer who made it from revoking or annulling the authority created by it.

2. PROBATE COURTS.—Probate courts are as truly as any other tribunals the offspring of the common law, and though their powers were exercised by ecclesiastical tribunals, yet they have been yielding to the modes and principles of the common law, as successive statutes have been passed relating to their powers and duties. Although their proceedings and acts are mainly prescribed by statute, yet that does not divest them of the powers and functions of a common-law court, except

in so far as such powers and functions are abridged, regulated and controlled by such enactments. In all else they possess the powers and attributes of a common-law court.

3. PROBATE COURT—REVIEW.—A probate court has jurisdiction to review, correct and annul its own orders and process where they are found to conflict with statutory enactments, as an incident of the general powers of that court. *In re Fisher,* 15 Wis. 511 ; *Waters v. Stickney,* 12 Allen, 1 ; *Holden v. Meadows,* June term, 1873.

4. NUNCUPATIVE WILLS.—In order to entitle a *nuncupative* will to probate, all the provisions of the law permitting and regulating such wills must be strictly complied with. *Dawson's Appeal,* 23 Wis. 69.

(1 *Chand.* 136.)

ERROR to the District Court for *Grant* County.

The case was this : After the death of Thomas P. Burnett, which occurred on the fifth day of November, 1846, and on the eighth day of the same month the plaintiffs in error applied to the judge of probate for the county of Grant for the appointment of commissioners to take charge of the property of Burnett, and they were so appointed by such judge. On the sixteenth day of the same month the same persons applied, on their own petition to him, for letters of administration upon Burnett's estate, alleging in their petition that he had died intestate ; and on that day they were appointed to that office, and entered upon the performance of the duties thereof, and so continued until the twenty-sixth day of January, 1847.. On the last mentioned day those letters were revoked by the judge of probate, upon the petition of the defendants in error, upon the ground that they had been improperly issued. From this order the plaintiffs in error appealed to the district court of the county of Grant. The court affirmed the order made by the judge of probate, and from the last mentioned order and decision the plaintiffs brought the case into this court by writ of error.

Various exceptions were taken to the ruling and decisions of the district court, on the hearing before it, upon the appeal from the probate court, the most important of which are stated in the opinion of this court.

*Crawford & Brunson*, for the plaintiffs in error, insisted that the judge of probate had no power to revoke the letters of administration granted to the plaintiffs in error, or to change or modify orders judicially made by him, and cited to that point, 3 Wend. 268, and the Rev. Stat. Wisconsin relating to the powers and duties of the judge of probate.

They also claimed that, inasmuch as the letters of administration were issued upon the basis that Burnett had made a *nuncupative* will, there was no power vested by law either in the court of probate or in the district judge to revoke such letters.

*Mills & Lakin*, for the defendants in error, insisted that courts of probate had power to *correct errors* made by them, and to revoke letters of administration improvidently or illegally granted by them, and to this point cited 1 Petersdorf, 56 ; Toller's Executors, 125, and note ; 4 Serg. & R. 201 ; Rev. Stat. 310.

They also insisted that the evidence given of the making a *nuncupative* will was wholly insufficient to establish it.

HUBBELL, J.   This case comes before us clothed with painful interest.   The untimely fate of the decedent, whose estate is sought to be administered upon, not less than the unhappy difference which arose in regard to its management so soon after his death, are well calculated to admonish us of the uncertainty and worthlessness of earthly possessions.

The members of this court hold in cherished recollection the character and public services of the late Thomas P. Burnett.   His high standing as a member of the bar, his position as reporter of the late supreme court, his ability and influence as a legislator and statesman, and especially his amiable private character, have induced a more than usually careful examination of this case, coupled with a deep anxiety to decide it in accordance equally with the principles of justice and law.

The conclusions to which we have arrived are now to be announced.   Thomas P. Burnett departed this life, at his own residence, in the county of Grant, the 5th day of November, 1846, leaving a wife, who survived him only a few hours, and two infant children, who are still living.   He had no other kindred within the territory of Wisconsin.   His personal and real estate were ample to pay the charges upon it and leave a very considerable surplus.   On the 8th of November following, it having been represented to the probate court that the estate was in a condition to suffer waste, that court appointed *Alfred Brunson* and *Henry Patch*, the father and uncle of the late Mrs. Burnett, *commissioners* to take charge of the property.   On the 16th day of the same month, the same persons, on a petition presented by themselves to the same court, were appointed *administrators* of Thomas P. Burnett's estate.

The last appointment was made from no new suggestion in regard to the condition of the property or of the parties interested therein, and it would seem to us to have been made without necessity and without the authority of law.   No notice appears to have been given to the next of kin, as the statute requires, and the thirty days, within which it was the absolute right of the next of kin to appear and claim letters of administration, had not expired.   This appointment was, in the highest degree, irregular, though not perhaps entirely void ; it was therefore the duty of the judge of probate at the earliest day possible to correct the error, if he had the power to do so.

The letters were continued in force, and the administrators acting under them made and filed an inventory and performed various other official acts until the 26th day of January, 1847, when they were revoked.   The order of revocation was made on the petition of *William Burnett*, the brother, and *Joseph H. D. Street*, the husband of a sister of the deceased.   A full and careful examination of the rights of the parties and of

the power of the court, in respect to this proceeding, appears to have been had by the judge of probate, who acted after the fullest consideration, and after hearing learned and able counsel upon the subject. The decision made by him was afterwards, on appeal, affirmed by the late chief justice of the territory, as presiding judge of the district court of Grant county, and that decision is now brought in review before this court.

The granting of letters, as we have before seen, to *Brunson* and *Patch*, was irregular, and the first question which demands consideration is, whether the judge of probate had power and right to revoke them.    It was strenuously urged in argument that this officer, acting under a special and limited jurisdiction, and being in fact the mere creature of the statute, had no right or authority to review or reverse his own acts.    To a limited extent only is the assumption on which the argument rests well founded.    Probate courts are only, in a qualified sense, the mere creatures of the statute.    They are, as truly as any other judicial tribunals, the offspring of the common law.    They existed in substance in England before the usurpation of the ecclesiastics snatched from the crown this rightful portion of its authority as the fountain of justice, and changed their form and mode of proceeding.    And ever since they fell into the hands of the church, they have been yielding to the modes and principles of the common law, as successive statutes have been called into existence by the necessities of the case to protect the liberty and property of the British people.    The statutes relating to these courts are therefore the instruments employed to restore them to their original character rather than the creative power which conferred their jurisdiction.    In England the ecclesiastical courts have always exercised the power of revocation.    Comyn's Dig., title, Administrator, B. 8 ; 1 Salk. 38 ; Bacon's Abr., title, Administrator.    And in that country, as in most, if not all, the states of the Union, they are courts of record, either by express

statute or immemorial usage.   In the territory of Wisconsin the right to revoke or reverse orders entered in the course of probate proceedings seems to have been very generally exercised, though it does not appear to have received the direct sanction of the higher courts.   The authority must be regarded as incident to the general powers of the court, and indispensable to a right exercise of those powers, otherwise great inconvenience would arise from the necessity of appeals to a higher court to set aside orders of an interlocutory character, frequently arising in the course of administration, and in regard to which the probate judge may be fully satisfied of his error.   Such a power, though not expressly granted by the statutes of Wisconsin, is fairly inferable from the clause in the administrator's bond, required to be given by section 23, pages 301, 302, which is as follows : " And if it shall hereafter appear that any last will and testament was made by the deceased, and the executor or executors therein named do exhibit the same into the court of probate, etc., if the said ——, within bounden, being thereunto required, do·render and deliver the said letter of administration, etc., into the said court, then the above written obligation to be void, etc."

If, therefore, there was a will made by the deceased, Thos. P. Burnett, capable of being proved, and the same had been exhibited in the probate court by the executors, and allowed and approved accordingly, it would have become the duty of the court, by legal inference and from the necessity of the case, to revoke the letters first granted.

This brings us to another question raised and urged by the plaintiffs in error, and far the most delicate and difficult to which our attention is drawn, to wit : " Whether the evidence taken before the judge of probate, which fully appears in the bill of exceptions, shows that the deceased, during the last day of his life, made and published a *nuncupative will*.

*Nuncupative* or unwritten wills were known to both the common and civil law (1 Inst. 24 ; Swinburne on Wills,

part 1) ; but never had been regarded with much favor, from their liability to abuse, and generally have not been permitted to pass real estate.    2 Black. Com. 500 ; Bacon's Abr., title, Wills, D.    In New York they are confined by statute to soldiers in actual service or mariners at sea.    2 Rev. Stat. (3d ed.) 121.    In Wisconsin they are permitted, but under peculiar restrictions.    Section 23, Rev. Stat. 182, is as follows : " No *nuncupative* will shall be good when the estate thereby bequeathed shall exceed the value of one hundred and fifty dollars, that is not proved by the oath of three witnesses at least, that were present at the making thereof, nor unless it be proved that the testator, at the time of pronouncing the same, did bid the persons present, or some of them, to bear witness that the same was his will, or to that effect ; nor unless such *nuncupative* will were made in the time of the last sickness of the deceased, and in the house of his or her habitation or dwelling, or where he or she had been resident for the space of ten days or more next before the making of such will, except where such person was unexpectedly taken sick, being from home, and died before he or she returned to the place of his or her habitation."    Other restrictions are imposed in the subsequent sections upon the probate of such wills, and directions given as to the time and manner of their production and the citation of parties interested.

And it may be laid down as a proposition, universally sustained by the courts, that to entitle a *nuncupative* will to probate, all the provisions of the law must be strictly complied with.    4 Rawle, 46 ;  29 Johns. 503.

In reference to the parties claiming to have the present will allowed, and to have been appointed executors under it, it has been alleged that they are estopped from setting it up against the next of kin, or others interested in the estate, by their own acts.    And were *Brunson* and *Patch* alone to be considered, we should have no hesitation in saying that the application on their part, for letters of administration, and their

acceptance of such letters and acting under them, ought for-ever to close their mouths as to such will. So wide a departure from the duty imposed on them, by their dying friend, in a manner the most solemn and impressive, cannot but induce a doubt of their real belief in the existence of the will, or their fidelity to its injunctions. We are not disposed, however, to impute to parties so nearly and tenderly connected with the deceased, and his infant orphan children, any other than proper motives and the most earnest, though misdirected, efforts to protect their estate and promote their welfare. From respect to the deceased, and out of a sincere desire to carry out his wishes in regard to the administration of the estate, we have reviewed the testimony more with a desire to discover proofs of his making, than of his not making the will. But we regret to discover no satisfactory evidence of his intention, either to bestow his estate generally, or to name his executors. His general expressions of concern for the property to be saved to his children, and his desire to have the father and brother of his wife, then living, aid her in its management after his decease, fall far short of full proof of the *animus testandi*, indispensable to make out the case. His bequest of the few peculiar articles, shown beyond question to have been designed by him for the individuals named as legatees, is entirely consistent with a design to leave his property generally to the disposition of the law. Whether the property bequeathed exceeded in value the sum of one hundred and fifty dollars does not clearly appear; nor is it of much moment; because, if the evidence can be deemed competent to show the making of a will, or the appointment of executors in fact, it cannot for a moment be supposed that this solemn proceeding was gone through by the deceased for the mere purpose of bestowing so trifling a part of his estate and designating his confidential friends to execute the trust. There is no ground whatever to maintain that the transaction shown by the witnesses makes out a *nuncupative* will of property

exceeding one hundred and fifty dollars, within the provisions of our statute. The declarations were insufficient in form; the witnesses were inadequate in number; and the mode of attestation, or calling their attention, lacked every essential requisite for such a purpose. Had it been the case of an unlettered man, ignorant of the special requisites of the law, we might have striven in vain to find a precedent to warrant us in calling it a will. But when we remember that the alleged testator was a man distinguished for his knowledge both of the letter and the practice of the law, we can hardly believe, that in the full possession of his mental faculties, he designed or attempted to dispose of his property in so irregular and informal a manner. He certainly would not have indulged in general or indefinite and unmeaning terms. He would have called the attention of those about his bedside; he would have explained his inability to write, and his intention to make a will; he would have said, "this can be done by words in cases of extremity. I wish you to bear witness to my statements; these are my executors; thus and thus I give my property; this is my will."

Such a man, on such an occasion, would have used solemn forms and precise, if not technical, language. He would, at least, have used the language of the law, when that was the most simple, the most expressive, and as familiar to him as household words.

The entire absence of such words and of such forms is conclusive evidence to us of the entire absence of any intention on his part to make a will; more than this, it is proof positive of a design not to do so; of a purpose to speak in terms which, to those who knew him and understood legal phraseology, would evince his design to avoid the very thing which it is now assumed he intended.

Entertaining these views of the whole case, we are satisfied that the judgment of the court below ought not to be disturbed.

Vol. II.—13

With reference to the appointment of administrators upon this estate, after the renunciation of the next of kin, it may be proper to remark, that although the matter is wholly confided to the discretion of the judge of probate, and he is bound to select such person as he shall judge most fit and most competent to manage its affairs, it has often been deemed proper, where no special objections existed, to select the general guardian of the infant heirs ; such a selection being deemed both most convenient and agreeable to those most deeply concerned in the matter.

Yet this can now be of no great importance, as the debts of the estate must be nearly paid off, and the personal assets will soon be collected or converted into money and ready for distribution, when a final close of administration will be made. In the meantime, and at all times, the real estate must continue under the charge of the general guardian.

Judgment affirmed, with costs.