## ADAMS, EXECUTOR OF HOLMES v. NICHOLAS.

### December 21, 1835.

*Rule to show cause why a new trial should not be granted.*

A will having been made subsequent to an alleged *donatio causâ mortis*, regularly proved before the register, and not impeached on the trial, is *conclusive* evidence that the gift was not made during such a last sickness as the law requires to constitute a disposition of property *causâ mortis*.

If at the time of the gift the sickness of the donor were such as to induce him to believe that he was near his death, and he had not time to make a disposition by will, yet if, afterwards, a will in writing should be made by him, and duly proved after his death, and not impeached on the trial, it is *conclusive* evidence that the donor had escaped from the peril of death impending at the time of the donation, so that it cannot take effect as a *donatio causâ mortis.*

THIS was an action of trover tried before STROUD, J. The verdict was for the plaintiff. The defendant moved for a new trial, which motion was argued by

*G. M. Wharton* and *J. C. Biddle,* for the plaintiff, and
*Hazlehurst* and *D. P. Brown,* for the defendant.

The facts are fully set forth in the opinions of the judges, which are placed in the order best calculated to present the history of the case.

STROUD, J.—The essential facts of this case are these. Moses Holmes, the plaintiff's testator, died on the 1st of November 1832. His disease, by common observers, was supposed to be *pulmonary consumption.* A physician who visited him once, and whose sole

[Adams v. Nicholas.]

object was to ascertain the state of his *mind*, considered him as labouring under a complication of diseases, one of which was *consumption*, another a *tracheal paralysis*, which deprived him wholly of the use of speech. His sickness, from whatever diseases it may have arisen, was of long continuance, according to the testimony generally. The plaintiff was a brother of the half blood of Holmes; and the defendant was an intimate friend. Holmes was not married, and resided with the plaintiff; was confined at his house during his sickness; and his death took place there. On Sunday the 21st of October 1832, the defendant visited Holmes, and received from him two gold watches, one of which he brought away with him; the other, though delivered to him by Holmes, was, in consequence of some objection by the plaintiff, left in Holmes's possession, and subsequently deposited in a trunk belonging to him, and being within his sick chamber. On the 22d of October, the defendant, in company with Stephen Gloucester, went to a gentleman of the bar; stated to him the circumstances connected with the supposed donation of the watches by Holmes on the day before; and, under his advice, with a paper writing which he prepared, the defendant, Gloucester, and an individual named Glascoe, repaired to the house of the plaintiff and requested to see Holmes. Gloucester and the defendant were admitted to his chamber. What occurred there was thus narrated by Gloucester. " Holmes bowed his head and waived his hand to me as I came in, as he could not speak, and then pointed to the nurse for chairs for us to sit down. Nicholas remarked, we had but a short time to stay, and said, ' Mr Holmes, I have come up to see you this morning about those watches which you gave me yesterday.' The nurse, at this, discovered some uneasiness, and said, ' His half brother [the plaintiff] said he should not be disturbed.' Nicholas pulled out the watch, which he had in his pocket, and he then told Mr Holmes of the watch which was in a trunk, and which Adams had refused to let him take away. He told him he had brought me up to see whether he meant to give those watches to him.

" Nicholas exhibited Brewster's memorandum, and said he had brought me and Glascoe up to see whether this was what he meant. I read the paper to Holmes."

Here the paper was read, and was in these words:

" This is the last will and testament of one Moses Holmes, made the 22d day of October, in the year of our Lord one thousand eight hundred and thirty-two. I revoke all former wills by me any time

[Adams v. Nicholas.]

heretofore made, concerning the articles herein devised. Item, I give and devise both my gold watches, one of which is carved and the other plain, and the gold chain attached to the plain watch, unto my well beloved friend Samuel Nicholas, of the county of Philadelphia, clothier, in whose possession I myself placed said articles. In witness whereof I have hereto set my hand and affixed my seal, this 22d day of October, in the year of our Lord one thousand eight hundred and thirty-two.

his<br>
" Moses  &times;  Holmes.<br>
mark

"Witness present at signing, S. W. Gloucester.

"I read this paper to Holmes, who did not seem to understand it. He made several signs. I then said, 'You give these watches to him if you die; if you live, they are to come back to you.' Holmes, by words and signs, expressed his assent. I asked that Glascoe should be brought up. The nurse would not permit it; and said Holmes had given *him* that watch yesterday. Holmes, at this, shook his fist at the nurse. Then Nicholas said to Holmes, 'If this is your will, will you sign this paper?' It was produced, and Nicholas handed him a pen. Holmes put the paper on his knee, and went to make the mark: his hand trembled very much. Nicholas took hold to steady it: nurse and I both objected to this: Holmes shook the pen at the nurse to hush. Holmes then undertook to put the pen to the paper again, and then dropped the ink now on the paper. The nurse remarked, 'Holmes did not make the *first* mark.' I then stepped forward and said to Holmes, 'You have made a blot here: now make a mark yourself.' He then made the mark now there; and I turned round to the nurse and said, 'Are you satisfied now?' she said, 'Yes.'

"Holmes pointed to his trunk; it was lifted up to him. He got his keys—several of them, handed them to me, having selected one, with which I unlocked the trunk. Holmes took out the watch and handed it to Nicholas. I took it from Nicholas, and requested that Glascoe and the family might come up; but this was refused by the nurse. Then Holmes took the watch from me and gave it to Nicholas."

On his cross examination, the witness said that Nicholas said to Holmes, " I came up about the watches you gave me yesterday;" and showing him the paper, said, " Here; Mr Brewster has written

an evidence of the gift." "What I told Holmes was the meaning of the paper, was what Mr Brewster said was its meaning." Another witness proved that Holmes had, a year or two before, declared his intention to give one of these watches to Nicholas.

The plaintiff, upon the opening of his case, made the usual proof of a demand and refusal of the watches; and gave in evidence a will made by Holmes, on the 29th of October 1832, and duly proved before the register, shortly after the testator's decease. This will gave to the plaintiff, absolutely, all his property. The words are : "I give all my real estate and personal property," &c.

The defendant, in opening his defence, claimed the property as *donationes causâ mortis.* The plaintiff's counsel declined addressing the jury ; and I told the jury that as there was no dispute about the facts, I would assume them to be precisely in accordance with the defendant's statement of them, and, *in point of law, on that statement, the plaintiff was entitled to their verdict.* I added, first, that I should not instruct them that a subsequent will was a revocation of a prior *donatio causâ mortis ;* but that the *fact* of a will having been made subsequent to the alleged *donatio causâ mortis,* regularly proved before the register, and not impeached on the trial, was *conclusive evidence* that the gift was not made during *such* a *last sickness* as the law required to constitute a disposition of property *causâ mortis."* And, secondly, that even if, at the time of the gift, the sickness was such as to induce the donor to believe, and he did believe that he was very near his death, and had not time to make a disposition of his property by will ; and yet, if afterwards, and after the lapse of more than six days, a will in writing should be made by him, and duly proved after his death, and not impeached on the trial, this was *conclusive* evidence that the donor had escaped from the *peril* of death which he supposed to impend over him when he made the donation, and it could not take effect as a *donatio causâ mortis.*

A motion for a new trial was made, the reasons for which call in question the correctness of these positions in the charge to the jury. Two other reasons have been added, namely : "Because the court decided the question as to whether Moses Holmes, at the time of the donation, was in his last sickness or not ; the same being a matter of fact which should have been left to the jury." And, "because the court decided all the facts in the case, and, in truth, withdrew the cause from the jury."

The first point of the charge to the jury is that on which the cause

[Adams v. Nicholas.]

hinges; and if the directions there given were right, they dispose, in effect, of every other objection.

The branch of the law to which the present case is referred, it is well known, had its origin in Roman jurisprudence. The earliest reported recognition of it by the English courts, is the decision of Lord Cowper in Hedges *v.* Hedges, *Prec. in Chan.* 267. The doctrine itself is, however, stated in *Bracton, fol.* 60, *cap.* 26. And *Swinburne* agreeing substantially with *Bracton,* and as a translation of the civil law without doubt as he supposed it to be, gives the following account: " Of gifts, in case of death, there are *three* sorts. *One* when the giver, not terrified with the fear of any present peril, but moved with a general consideration of man's mortality, giveth any thing. *Another,* when the giver, being moved with imminent danger, doth so give, that straightways it is made his to whom it is given. The *third* is, when any being in peril of death doth give something, but not so that it shall presently be his that received it, but in case the giver do die." *Swin.* 22, 23. Lord Hardwicke, in Ward *v.* Turner, 2 *Ves. Sen.* 439, and Lord Loughborough, in Tate *v.* Hilbert, 2 *Ves. Jun.* 116, have cited and commented upon this passage of Swinburne. Lord Hardwicke, after an elaborate examination, concludes, that, by the Roman civil law, delivery of the subject of the gift was not requisite, either to the *first* or third species of Swinburne's classification, but to the *second* only, yet decides that, according to the law of England, there could be no valid donation under this name *without delivery.* And such is now the settled doctrine, both there and in this country. Bunn *v.* Markham, 7 *Taunt.* 224; Hawkins *v.* Blewitt, 2 *Esp. Rep.* 663; Wells *v.* Tucker, 3 *Binn.* 366; Pennington *v.* Gitting, 2 *Gill & Johns.* 208; M'Dowell *v.* Murdoch, 1 *Nott & M'Cord* 237. It does not appear, however, that he restricted gifts *causâ mortis* to any particular species, notwithstanding he asserted that, by the civil law, delivery was essential to the *second* only. The case before him required no such discrimination, and he made none.

Lord Loughborough censures Swinburne's description as perplexed, arising from his " coupling the description of a legacy with a very short text of the civil law" in regard to *donatio causâ mortis;* and he adds: " the two first [kinds] are clearly mere donations;" and by a quotation from the Digest he shows, satisfactorily, that the civil law was ultimately narrowed down to the *third* class, as the only valid *donatio causâ mortis.*

[Adams v. Nicholas.]

The charge to the jury, which is objected to, assumes that with us, a *donatio causâ mortis* must be made during the *last* sickness ; and then only, provided the party making it be so affected by the sense of approaching dissolution, as to be unable to make a written will.

The earliest decision on this subject was by lord Cowper in 1708, reported in *Finch's Precedents in Chancery* 269, under the name of Hedges *v.* Hedges. The language there used is this : " *Donatio causâ mortis* is when a man lies in extremity, or being surprised with sickness, and not having an opportunity of making his will, lest he should die before he could make it, gives, with his own hands, his goods to his friends about him. This, if he dies, shall operate as a legacy ; but if he survives, the property reverts to him." This case has been referred to repeatedly by subsequent chancellors, judges and distinguished judical writers ; its aid invoked upon particular points ; and its authority generally, by some, expressly admitted, and by none ever impeached.

The next case after Hedges *v.* Hedges was Jones *v.* Selby, *Finch's Prec. in Chan.* 300. This, also, was before lord Cowper, who decreed against the donation claimed, upon grounds which required but a slight notice of the general doctrine on the subject. In 1717, a third case, Drury *v.* Smith, 1 *P. Wms* 405, was decided by lord Cowper. The gift was in the donor's *last sickness* according to the report, fully proved, and sustained by the decree. A prior will existed in this case, which made no particular mention of the specific subject of the gift, but devised the *residuum* in general terms ; and the only objection urged against the claim was, that, *pro tanto*, a will in writing might thus be revoked by parol—a reason which the chancellor deemed insufficient. Lawson *v.* Lawson, 1 *P. Wms* 441, was decided in the next year. Sir Joseph Jekyll, master of the rolls, remarked, " there being a delivery by the testator in his *last sickness*, and *when he was so near his end,* and bidding the wife apply it to no other use than her own, made this part of the case plain."

A case reported in *Select Cases in Chancery, fol.* 14, under the name of Ashton *v.* Dawson, came before Lord Chancellor King, in 1725, in which the question of *donatio causâ mortis* was incidentally involved. It was this. One *Cowper,* after he had made his will, and about three or four days before his death, gave Mrs *Dawson* some bank notes, to her own use if he died, else to be returned. On his death, *Ashton,* the executor, on inquiring into the affair, said, 'he was very well pleased that they were given her ;' she desired him

[Adams v. Nicholas.]

to take the notes and employ them to the best advantage for her; he took them and gave her a note for them; but he, afterwards, refusing to deliver up the notes, an action at law was brought on his note, and judgment recovered against him; whereupon, he brought a bill in chancery, but was denied relief. Curia—"You come here to be relieved against the note, which cannot be, but on the foot of fraud; at the time of giving the note, the whole affair was examined into. It is not a legacy, nor is there occasion for the executor's assent to it. It is not a gift at common law, *but in view of death.* Here are express words; but if he had used no words, and had been *near* death, it had been looked on as a *donatio causâ mortis.*" And the bill was dismissed with costs. This cause was re-heard before *Lord Chancellor King, the 6th of August* 1725, who affirmed the decree, but inclined to have ordered a trial at law, had not Ashton given a note.

It is difficult to conjecture the ground of lord King's doubt, as to this gift constituting a *donatio causâ mortis*, unless it be the *defect* in the statement of the case, of the donor's *sickness* at the time of the gift. For here was an actual delivery of an article, the proper subject of such a gift, and the language accompanying the donation was accurately expressive of its character, *causâ mortis*, and the donor was within three or four days of his decease. It is not stated, however, that he was labouring under any kind of *sickness*; and though the language used in connexion with the gift, would, ordinarily, perhaps, be taken to imply sickness, yet the same language might, very naturally, be employed by a person in old age without bodily disease. At all events, as nothing like fraud in Mrs Dawson is hinted at, the just inference, in regard to lord King's opinion, would seem to be, that he did not deem the general consideration of man's mortality a valid ground for sustaining such a donation.

Smith *v.* Smith occurred at common law, at a sitting of *Nisi Prius,* before lord Hardwicke, as chief justice, in 1734. Under the direction of the court, the jury found in favour of the defendant, who claimed the donation. It does not appear from the report, whether the donor was in sickness at all, at the time of the gift, nor does the evidence show a delivery, but rather the contrary. No notice is taken of this decision by lord Hardwicke himself, in Ward *v.* Turner, although, if deemed sound, it had a strong bearing on the principal point, there discussed at great length, and finally decided; and

[Adams v. Nicholas.]

its authority is denied by Chief Justice Gibbs, in Bunn *v.* Markham, who calls it "*a very confused case.*"

In 1735, Miller v. Miller, 3 *P. Wms* 356, was ruled by sir Joseph Jekyll, as master of the rolls. This was a plain case, the gift having been made but "*about an hour* before the donor's death." This decision is important, as containing an express rejection of the doctrine that the general consideration of man's mortality is sufficient to support these donations. The language of the master of the rolls is, "neither are gifts of this kind good, *unless made by the party in his last sickness.*"

The two next cases were decided by lord Hardwicke : Snellgrove *v.* Baily, 3 *Atk.* 214, in 1744; and Ward *v.* Turner, 2 *Ves. Sen.* 439, in 1752. The latter has been already noticed; and the former is so meagre in the statement of facts, as to furnish no authority either way in regard to the present inquiry. Hassel *v.* Tynte, *Amb.* 318, was a bill by the plaintiff, to have the benefit of a gift of 1000 pounds mortgage, made to her by lady Tynte, her grandmother. The case states, that lady Tynte being entitled to a sum of 1000 pounds, secured by mortgage, and being old and afflicted with a disorder of which she died about six weeks afterwards, delivered the deeds and writings, relating to the mortgage and estate, to the plaintiff, in the presence of several witnesses, one of whom proved that she made use of this expression at the time, "I deliver this as my act and deed." Afterwards, (at what time does not appear) she said she hoped the plaintiff would be a good girl, for that she had given her a mortgage of 1000 pounds for her *own immediate use and benefit.* The principal questions raised were, whether this was a *donatio causâ mortis,* or a *donatio inter vivos.* Lord Hardwicke remarked, that it looked more like *donatio inter vivos,* but added, "there is such sort of *donatio mortis causâ* mentioned in the civil law." The great doubt, however, appears to have been, whether a mortgage could pass by a *parol* gift; and inasmuch as the plaintiff was residuary legatee of lady Tynte's will, and, in that capacity, would in a short time be entitled to the money due upon the mortgage, the question as to the gift of the mortgage was reserved. The date of this *discussion* (for there was *no decision*) was 1756.

Such was the state of the law on this subject, when sir William Blackstone commenced his lectures at Oxford, his introductory having been delivered the 25th of October 1758. In 1765, he published the first volume of the Commentaries, and the three succeeding

I.—N

[Adams v. Nicholas.]

volumes in the next four years. He designates a donation *causâ mortis*, "a death bed disposition of property," and defines it to be, "when a person, in his *last sickness*, apprehending his dissolution *near*, delivers or causes to be delivered to another, the possession of any personal goods to keep, in case of his decease." The authorities to which he refers are, Hedges *v.* Hedges, Drury *v.* Smith, Lawson *v.* Lawson, and Miller *v.* Miller, already particularly noticed.

No other British decisions, *prior* to the Declaration of Independence, are reported. Subsequent decisions are not authority, but it may not be amiss to observe, that none of these (unless Hill *v.* Chapman, 2 *Brown's C. Rep.* 612, is to be deemed an exception) conflicts with the text of Blackstone, and that several expressly confirm it. See Blount *v.* Burrows, 1 *Ves. Jun.* 547, before lord commissioners Eyre and Ashurst; and Gardner *v.* Parker, 3 *Madd. Rep.* 184, before sir John Leach, master of the rolls, to which may be added, the authority of lord Eldon, who uses this emphatic language in Duffield *v.* Elwes, 1 *Bligh's Rep. (new series)* 530: "nothing can be more clear than that the *donatio causâ mortis* must be a gift made by a donor in contemplation of the conceived *approach* of death."

Hill *v.* Chapman was decided in 1789 by lord Thurlow. The report is exceedingly defective in the statement of facts, not disclosing whether the donation was made during sickness or in perfect health, nor how long before the death of the donor it was *last* bestowed. All that can be ascertained from the report is, an undoubted purpose, on the part of the donor, to confer the gift; for his wishes were repeatedly declared, and the article as often delivered, during a period embracing several years. In relation to one material circumstance the case requires particular notice, namely, that the last bestowal was posterior to the date of the *last will* of the donor; a fact which escaped the observation of the annotator on *Brown's Ecclesiastical Law*, who adduces this case as an authority for the position that a subsequent will is not a revocation of such a gift.

I have expressed a doubt whether this case should be considered as an exception to the doctrine of Blackstone; because I deem it more probable that so negligent a reporter as Brown has omitted to note the fact of the donor's last sickness at the time of the gift, than that lord Thurlow should have decided so important a point, in opposition to so many prior decisions, without the slightest notice of a dissent from their authority. All, indeed, in the way of observation, which the report ascribes to him, is the simple declaration that he

[Adams v. Nicholas.]

thought " the gift good as a donation *causâ mortis, being reported by the master.*"

*Roper,* in his Treatise on Legacies, takes notice of this omission in the report, and adds : " it must be presumed to have been so [in the last illness], or the gift would be destitute of one of the *essential* requisites constituting a *donatio mortis causâ.*" 1 *Roper on Legacies* 35. *Roberts on Wills.* vol. 1, *p.* 11, *note 5* ; and Holt, in a note to Sprately *v.* Wilson, 1 *Holt's N. P. Rep.* 10, quote this decision as a recognition of the doctrine, that it is not necessary that the giver should be in actual and imminent danger of death, but only that he should be moved by the general consideration of mortality. The former of these writers, adopts Hedges *v.* Hedges as furnishing the true exposition of the law of England on this subject, and Hill *v.* Chapman as a *solitary* exception to the general current of authority : while the latter, after having stated that, by the Roman civil law, " a *donatio causâ mortis* is a gift by a person believing himself to be *at the point of death,*" says, that by the best commentators on that law, it was deemed sufficient to support such gift, that the party making it was moved thereto " by a general consideration of mortality ;" and adds, that the best authorities in English law, " in adopting the Roman title, have adopted it with the large interpretation of the commentators ; extending the title and the legal qualities of it to *the general consideration of mortality* ;" and for this broad conclusion he refers to Hill *v.* Chapman, and to this only !

Coming down, then, to the only decision in our own state, we have the distinct recognition of Blackstone's definition, in the following language of Chief Justice Tilghman, in Wells *v.* Tucker : " A *donatio causâ mortis* is a gift of a personal chattel made by a person in his *last illness,* subject to an implied condition if the donor recovers the gift shall be void ;" and he continues, " it was introduced into the common law from the Roman civil law, but *not* in the full extent in which it is recognised in the latter."

Whatever contradiction exists in the cases on this subject may be traced to inattention to the *limited* adoption of the civil law, thus noticed by Chief Justice Tilghman. Lord Hardwicke, although the first to indicate it, in Ward *v.* Turner, does not appear, nevertheless, to have drawn the line of discrimination with any degree of precision, nor indeed to have borne in mind, at all times, that any limitation existed.

From this general review of the cases, the conclusion appears to

[Adams v. Nicholas.]

me to be fully warranted, that Hedges *v.* Hedges contains the true doctrine on this branch of the law, and if so, the instructions to the jury were right.

Two important decisions remain to be noticed, which, though not upon the same topic, rest upon principles strongly analogous, and fully confirm this view. The first is Prince *v.* Hazleton, 20 *Johns. Rep.* 502, in the court of errors of the state of New York. The syllabus of the report sufficiently indicates its relevancy. It is thus: "A nuncupative will is not good unless it be made when the testator is *in extremis*, or overtaken by sudden and violent sickness, and has not time to make a written will. By the words "*last sickness*," in the purview of the statute, is to be understood the "*last extremity*." Chancellor Kent, whose opinion prevailed with a very large majority of the court, in the course of his remarks holds this language: "There is a very close analogy between these nuncupative wills and a gift upon the death bed, or a *donatio causà mortis;* and these gifts are defined by the court of chancery, in Hedges *v.* Hedges, in the *very terms* of a proper nuncupative will." The *second* is the "Case of Priscilla E. Yarnall's will," 4 *Rawle* 46, which, like Prince *v.* Hazleton, arose upon an alleged *nuncupative will.* Judge Rogers, delivering the unanimous opinion of the court, refers to and *expressly* adopts the views of Chancellor Kent in Prince *v.* Hazleton, and decides that the nuncupation asserted in the case then under his consideration, was defective, because not made in the condition of impending dissolution, which, in legal contemplation, is meant by *last sickness.* The facts of that case might, so far as the argument is concerned, be substituted for those proved on the trial before me. The deceased there had been afflicted with a pulmonary consumption for about six months, of which she died on the 27th of the month upon the 18th of which the alleged nuncupation was made. She retained the possession of her mental faculties until the last hour of her life.

Of the remaining reasons for a new trial, the last two only require distinct notice. As to the *first* of these, the courts, both in Prince *v.* Hazleton and the case of Priscilla E. Yarnall's will, have given a *legal* construction to the term "*last sickness.*" But that the uncontroverted fact of the making of the last will a week after the alleged donation precluded the inquiry, the jury might have been called upon to determine whether, at the time of the alleged donation, the donor was in *extremity*, the legal import of *last sickness.* In regard

[Adams v. Nicholas.]

to the supposition that the facts were withdrawn from the jury, this proceeds upon an obvious misapprehension. The facts were free from dispute, and so the jury were told. The plaintiff having declined addressing the jury, the case was treated precisely as if he had admitted every thing which the defendant undertook to prove; whatever, therefore, the evidence *conduced* to prove for the defendant, was assumed to have been established. He had stated his defence to be the gift of the watches *causâ mortis.* This was his whole defence; and no fact being contested, it was the duty of the court to decide the law. Malson *v.* Fry, 1 *Watts* 433; Star *v.* Bradford, 2 *Penns. Rep.* 398; Jackson *v.* Betts, 9 *Cowen* 225; Fox *v.* Clifton, 9 *Bing.* 115; 23 *E. C. L. Rep.* 274; Rung *v.* Shoneberger, 2 *Watts* 27; Weidler *v.* The Farmer's Bank of Lancaster, 11 *Serg. & Rawle* 134.

PETTIT, *President.*—In the case of Hedges *v.* Hedges, determined in 1708, *Prec. in Chan.* 269, Lord Chancellor Cowper thus describes a *donatio causâ mortis :* "Where a man lies in extremity, or being surprised with a sickness, and not having an opportunity of making his will, but lest he should die before he could make it, he gives, with his own hands, his goods to his friends about him; this, if he dies, shall operate as a legacy; but if he recovers, then does the property thereby revert to him." Sir William Blackstone, in the second volume of his Commentaries, page 514, after some remarks upon bequests by testament, says : " Besides these formal legacies contained in a man's will and testament, there is also *permitted* another deathbed disposition of property, which is called a donation *causâ mortis;* and that is, when a person, in his last sickness, apprehends his dissolution near, delivers or causes to be delivered to another the possession of any personal goods (under which have been included bonds, and bills drawn by the deceased upon his banker) to keep in case of his decease. This gift, if the donor dies, needs not the assent of his executor; yet it shall not prevail against creditors; and is accompanied with this implied trust, that if the donor lives, the property thereof shall revert to himself, being only given in contemplation of death or *mortis causâ.* This method of donation might have subsisted in a state of nature, being always accompanied with delivery of actual possession, but seems to have been handed to us by the civil lawyers, who, themselves, borrowed it from the Greeks." While the learned commentator refers to Justinian for the views of the Roman jurists, and to Homer and Euripides for the customs of

[Adams v. Nicholas.]

ancient Greece, he cites the case of Hedges *v.* Hedges as containing the principles recognised and adopted in the English law.

In Wells *v.* Tucker, 3 *Binn.* 366, Chief Justice Tilghman denies the sanction by the common law of the principles of the Roman civil law upon this subject, in their full extent, and uses the following language : " A *donatio causâ mortis* is a gift of a personal chattel made by a person in his last illness, subject to the implied condition, that if the donor recovers, the gift shall be void ;" he adds, " to gifts of this kind, as incorporated into the common law, delivery is necessary." In the same case Judge Yeates says : "it is agreed, on all hands, that, in the case of a *donatio causâ mortis,* the gift must be made in the party's *last sickness.*"

I have carefully considered all the authorities referred to by the counsel, in the argument of this cause ; and whatever views may be found in the Institutes of the Civil Law ; whatever notions may be deemed to be in accordance with abstract elementary principles relative to conditional gifts ; whatever speculations may be indulged in as to the natural right of an individual over his own property, I cannot resist the conviction that the common law, as received in Pennsylvania, never countenanced or permitted the doctrine, that a *donatio causâ mortis* could be sustained upon broader grounds than those stated by the eminent judges whose opinions are above exhibited.

In the case before us, I am of opinion that there was a *donatio causâ mortis* to Nicholas, if the written will of the 29th of October 1832 be thrown out of the question ; and this brings me directly to the point, Was the mere making of that will a circumstance sufficient, of itself, to repel the proof growing out of the other facts, that Holmes was *in extremis* ; or was the said written will a revocation of the previous conditional gift ?

Lord Chancellor Cowper makes it an essential ingredient in a *donatio causâ mortis,* that the party *had not an opportunity of making a will.* Chief Justice Tilghman, in Wells *v.* Tucker, says, he inclines to the opinion that a *donatio causâ mortis,* partaking of the nature of a legacy, is revocable ; and Judge Yeates, in the same case, meets the question unreservedly in the following passage : " Moreover, we have the authority of the lord chancellor for asserting that a *donatio causâ mortis,* taking place *in futuro,* is revocable, as a will, during the life of the party ; Jones *v.* Selby, *Prec. Ch.* 303 ; and the reason why it should not prevail against creditors is, that it is considered as a legacy. Drury *v.* Smith, 1 *P. Wms* 406 ; 2 *Bl. Comm.* 514.

[Adams v. Nicholas.]

According to the language of the chancellor, in the last case, a man certainly, notwithstanding his will, has a power to give away any part of his estate in his lifetime. He might, in his lifetime, after the making of his will, give away any part of his estate *absolutely*; and by the same reason he might do it *conditionally*. The conditional gift presupposes the power of revocation; were it not so, a gift *bona fide*, in the lifetime of the party, would prevail against creditors after his death."

These authorities might be deemed sufficient to control this case. But they are sustained by sound reason. The right of disposing of property after death is merely a creature of the civil state, which has permitted it in some countries, and denied it in others; and even where it is permitted by law, it is subjected to different formalities and restrictions in almost every nation under heaven. 2 *Bl. Comm.* 491. When the law gives permission to a party to make a gift *causâ mortis*, only in case of inability and want of opportunity, from the surprise of a last sickness, to make a will, it must necessarily be regarded as withholding that permission, when the existence of such ability and opportunity is made manifest by the actual execution of a testament. While, therefore, Holmes was, in the common acceptation of the term, in his *last illness*, he was, nevertheless, not in *such a last illness* as the law has designated for the support of this species of disposition of property. Again, Holmes had a clear right to revoke, in express terms, the donation to Nicholas. He must have had the same right to do it in any other manner equivalent thereto. The written will of the 29th of October 1832, giving all the property of Holmes to Adams, would have revoked any former written will concerning the whole, or any part of his property. I know of no principle, then, upon which it can be asserted that the will of the 29th of October can be regarded as not having the same effect upon the prior conditional gift.

These *donationes causâ mortis* cannot be considered as entitled to much favour. Chief Justice Tilghman, in Wells *v.* Tucker, observes, that, "as they are not subject to the forms of nuncupative wills, they are certainly of a dangerous tendency;" and Judge Yeates, impressed with the same sentiment, remarks, that, "no reasonable man can doubt that frauds and perjuries may arise from parol testimony in regard to them." It was laid down by Judge Rogers, in pronouncing the opinion of the court in the case of Yarnall's will, 4 *Rawle* 62, that even " nuncupative wills, though tolerated, are by no means favourites of the law."

It has been held that there may be a *donatio causâ mortis* of bonds, bank bills and bills payable to bearer.   Ward *v.* Turner, 2 *Ves.* 431 ; Miller *v.* Miller, 3 *P. Wms* 356.   Chitty, in his note to 2 *Bl. Comm.* 514, speaks of the statute of 36 *Geo.* 3, c. 52, sec. 7, as subjecting a *donatio causâ mortis* to the duties imposed on legacies.   The legislature of Pennsylvania, in the act of the 7th of April 1826, relative to the tax on collateral inheritances, have endeavoured to protect the public revenue, by providing for the case of transfers by deed, grant, bargain or sale, intended to take effect in *possession* or *enjoyment after* the death of the grantor or bargainer, and by requiring an additional oath or affirmation to be taken by every executor and administrator ; but whether they contemplated the right as existing at all in any one to make this species of disposition of property, where actual *delivery precedes* the death of the party, might, possibly, become a question not free from difficulty, should an effort be made to evade, by a *donatio causâ mortis,* the operation of that act.   However this may be, I certainly do not feel myself justified in going beyond the limits prescribed by the judges of the supreme court in Wells *v.* Tucker.

Then, as to the case now before us, whether it be held that Holmes was not *in extremis* in a legal sense, or that the written testament was a revocation of the prior conditional donation, I am of opinion, that upon the facts as exhibited by Nicholas himself, a conclusive legal bar was presented to his claim ; and, of course, that the judge before whom the cause was tried, was right in his instruction to the jury.

Concurring, generally, in the views just delivered by Judge STROUD, I have thought it proper, as there is a difference of sentiment upon the subject, to give this brief outline of the principal grounds of my own determination.

JONES, J.—It appears to me that a new trial ought to be granted. The important facts are these.   Moses Holmes was the owner of the two gold watches in question.   At the time of the transaction, he was *sui juris* and *compos mentis,* and being such, he expressed a purpose to give these watches to the defendant, and in execution of that purpose, actually delivered them, with his own hand, into the hand of the defendant.   The watches have remained in the defendant's possession from the delivery, and by force of the delivery thus made, to the present moment.   Holmes died a few days afterwards,

[Adams v. Nicholas.]

having made his will subsequently to the gift; but he did no act to recover the possession of the watches, nor did he ever express a wish to have them again. His executor brings this action. These facts constitute all the elements of a valid transaction, and are operative to vest the title in the watches indefeasibly in the defendant. They are so upon the principles of general jurisprudence touching matters of common right, principles which cannot be controlled or modified, except by acts of legislature, and which never have been abridged, in any essential point, by any act of the parliament of England or of our own legislature. A moment's examination of the facts enumerated, will show their import and bearing on this question.

First. Holmes had the property in these watches at the time of the gift. This very action is founded upon his right of property, which, the plaintiff says, was transmitted to him by the will. The right of property contains the right to dispose of it in any lawful way: it includes as much a right to give, as to sell, or to retain and enjoy. And if it be conceded that Holmes had the right, at the time of making this gift, to dispose of these watches by sale, and was legally competent to exercise that right, he also had the power to dispose of them by gift; the rights of creditors not being in question.

To deny this power to the donor, is to deny him one of the most important elements of the right of property; a right which involves the power to destroy the thing owned, if it be liable to destruction. I admit that some modifications have been made of the right of property in lands and chattels, but they respect rather the *mode*, or the *occasion* of its exercise, than its *extent*. Lands cannot now be given except by writing. Formerly, a parol feoffment of land, with livery of seisin, was a valid transfer. This change, however, was wrought by statute.

The statutes 1 *Rich.* 2, ch. 9, 13 *Eliz.*, ch. 5, and 27 *Eliz.*, ch. 4, avoid gifts made in fraud of creditors. These, however, are not properly statutes in restraint of a common right, for no man has a right in any way to perpetrate a fraud.

The statute made in restraint of nuncupative wills, may be referred to in this connection. If this statute be considered a restraint at all, it is a restraint of the *mode* in which the right shall be exercised, rather than of the general power which a man possesses over that which is his own.

These instances show, however, the correctness of the general position, which, indeed, is so elementary in its character, that it is

I.—O

[Adams v. Nicholas.]

difficult to discuss it.    They show, also, that it needs the force of a statute to abridge or modify the right.

The legislature has seldom interfered with it so far even as to qualify its exercise, and for good reason.    It constitutes the chief value of property.    So unlimited is this power by our law, that a man may give the whole of his property to strangers, and leave his family dependent upon the public.    In this respect, the jurisprudence of this country and of England is peculiar.

There is no statute or act of assembly which abridges, otherwise than has been stated, the power of a man to give that which is his own, nor any which regulates the *form* of a gift *inter vivos*.    The principles of the common law, however, require the delivery of the thing intended to be given, in order to constitute a gift.    By definition, it is in the nature of an act executed, like a feoffment at common law ; it operates by transmutation of possession, and it is essential to its completion, that the donor divest himself of the possession of the thing given, and vest it in the donee.    1 *P. Wms* 405.    And most of the cases which have occurred, have turned upon the sufficiency of the delivery.    2 *Ves.* 431 ; 3 *Atk.* 213 ; 3 *Mad.* 184 ; 1 *Sim. & Stuart* 239 ; 2 *Ves. Jun.* 111.    In 2 *Swanst.* 107, *note*, the cases are collected in which that was the question.    That was the principal question in Wells *v.* Tucker, 3 *Binn.* 366.    The power of the owner to give, if of competent age and mind, has never been doubted ; and, in these respects, the competency of Holmes is not called in question.

Second.    The next fact in the case is, that Holmes did exercise this right of property intelligently and intentionally, and consummated his intention by the actual delivery of the watches to the defendant.    It is impossible for me to doubt that Holmes intended that Nicholas should have these watches in preference to Adams ; and I should regret the operation of any rule of law which would frustrate his intention.    In point of justice, this plaintiff, I conceive, has no right.

If Holmes had not delivered the watches, the property in them would not have passed to the defendant ; but upon this point, cases are numerous which show that an actual delivery, by the proper hand of the donor, into the hand of the donee (as was the fact in this case) is not necessary.    This shows that courts have relaxed the rule as to delivery, in aid of the exercise of the right.

The delivery having been made is not a nullity.    At least it

[Adams v. Nicholas.]

changed the relation of Holmes to the chattels. Holmes could not have brought trespass against Nicholas for the watches. He could not have brought trover without a demand and refusal. If we suppose the gift to have been revocable and revoked, still the watches would be *choses in action*, not in possession ; and they became so, not by force, fraud, or otherwise by wrong, but by the intention and act of Holmes himself.

If, therefore, the gift was not a *donatio mortis causâ*, and revocable, it would have been out of the power of Holmes, if he had repented of the gift, to have reclaimed it from Nicholas.

It has been argued that it is against the policy of the law to encourage gifts of this nature ; but it is sufficient to answer that it is more against the policy of the law to abridge the dominion of a man over his property. It has never been done, except by statute ; and no statute has been made touching the exercise of the right in such a case as this. The reason is, that the requisite of delivery to constitute a transfer by gift, has been deemed a sufficient protection against fraud, especially under the rule of evidence, which requires the most convincing proof in cases of this kind. 3 *Binn.* 370.

But the difficulty raised in this case touches the matter of right, not the evidence of its exercise. Indeed, the fact of the gift and delivery is conceded.

Upon these general views I should be content to rest the case. But it has been argued chiefly upon the principles relating to donations *mortis causâ*, and I am satisfied that it was a gift of that description. I will, therefore, proceed to examine the case upon these principles. If it be conceded that a man cannot make a *donatio mortis causâ* during health, though he should, by express terms, annex that condition to the gift ; still, it would not follow that he might not, by express terms, make an absolute gift during his last sickness. Upon general principles he may give absolutely, or upon any lawful condition, at any time. There is no principle of law which makes sickness a disability comparable, in any sense, to infamy, coverture or lunacy. The dominion of a proprietor is not lessened by his approach to the extremity of his last sickness, provided he retains a disposing memory.

If, therefore, the owner of a chattel, the hour before his death, in the full exercise of his mental powers, gives and delivers it to another, declaring that he gives it *absolutely* and not *causâ mortis*, the

law would not annex a condition contradictory to the expressed intention and purpose of the donor.

If this be so, then he has the right to give conditionally, as Holmes did, in this case, or he may annex any other lawful condition to the gift.

The right to give absolutely includes the right to give conditionally. *Cujus est dare ejus est disponere.*

The rule of the Roman law is, that a donor may annex conditions to the gift at pleasure, if he does it at the time of the gift, but not afterwards. *Furgole, Traité des Testaments, ch.* 7, *sect.* 7, *No.* 79, *vol.* 2, *p.* 476.

The rule of the common law is the same. Unless this be conceded, sickness is incompetency to perform, at least, one civil act, and that too irrespectively of mental capacity.

But if a man, under the pressure of an alarming illness, gives in general terms, not inconsistent, however, with the condition that the thing given shall be restored to him if he should recover, the law supposes him tacitly to annex that condition; that is, the law interprets the act by the *actual condition* of the donor, instead of applying the general rule that an act should be construed most strongly against the person performing it. In other words, the law deems and denominates it a *donatio mortis causâ.* The principle therefore is, not that sickness is incompetency to give, either absolutely or conditionally, as the donor shall see fit to express; but it is, that if a man in peril of death gives by general words, the law supposes that he gives because he fears that he shall die, and it allows to the act performed, in these circumstances, no greater effect than it would have if he had expressed that condition.

It is obvious, therefore, that the implication is for the benefit of the donor. Its operation is to convert that which would otherwise be an absolute gift, into a conditional gift, thus inverting the general rule; and the further we recede from the extremity of the sickness of the donor towards the commencement of the disease, and still imply this condition, the more it is for his benefit.

I see no danger in giving a liberal interpretation to this principle; and certainly, if it is confined within the limits contended for in this case, it would be little better than nugatory.

In illustration and confirmation of the principle, as explained, I may refer to *Loisel's Institutes, liv.* 4, *tit.* 4, *sect.* 2; *Ferriere sur la Coutume de Paris, art.* 277.

[Adams v. Nicholas.]

The argument which would confine this species of disposition to the extremity of the last sickness, is liable to serious objections on other grounds. If a dying man makes a gift in general terms, how can he be supposed to give upon the tacit condition that the donee shall restore it to him if he recovers? There is better reason to suppose the gift was intended to be absolute, where the donor despairs of life. To supply the condition by implication, it seems to me that the law requires such circumstances as naturally would produce, in a reasonable mind, the state of mingled hope and fear. If there is no peril apprehended by the donor, and yet he gives in terms of absolute gift, why should it not be deemed such? If despair of life occupies the mind of the donor, how can the law suppose that he gives under any expectation of the return of the gift? But if the donor *fears* that he shall die of his sickness, but *hopes* that he may recover from it, the uncertainty is consistent with the delivery of the gift, and the implied condition to return it.

This error is occasioned by viewing the subject in retrospect from the event.

It is commonly said, that a donation *mortis causà* can be made only during the *last* sickness. It would be strictly correct to say, that such a gift becomes perfect and absolute only in the event of the death of the donor of the sickness during which it was made. But, at the time of the gift and delivery, the event of the sickness is uncertain. The donor gives, not knowing whether he shall live or die; the condition is annexed because of the uncertainty. If he knew he should die, he would give absolutely. If he knew he should live, he would not give at all. The design of the condition (and from that the gift is denominated) is, to supply the want of knowledge, and it is adapted to either event. The *use* and the whole value of the condition is, to enable the donor to reclaim the gift in the event of his recovery. If an action were brought by the donor to recover the chattel, and the donee should plead that the donor gave it to him, the donor might reply, that it was a gift *causà mortis*, and by his recovery from the sickness the gift was defeated. In cases where the donor dies, the condition is discharged by that event, and the gift becomes absolute. The condition is, then, of no value to the donor; and it would not have been annexed if the event had been foreseen. It is correct, therefore, standing at the bedside of the donor, and speaking at the time of the making of the gift, to denominate it a *donatio mortis causà,* although neither the

donor nor the donee knows whether the gift will be defeated, or become absolute. If land were to be conveyed upon condition that the grantor should have it again if he recovered from a sickness then upon him, it would not be doubted that the conveyance *created an estate* from the delivery of the deed, though it would be conditional until the event of the sickness was known. In such a case, we should not transpose, in point of time, the unknown event upon which the estate is made to depend, to the time of the sealing and delivery of the deed, in order to make it one of the conditions of the validity of the deed, indispensable to the creation of an estate, and to the competency of the donor to make it. Now this species of gift is confined to chattels, which *pass by delivery*, and therefore the delivery is to the chattel what a conveyance by deed is to real estate. Lawson *v.* Lawson, 1 *P. Wms* 406. But the argument of the plaintiff is, that the delivery of the chattels, in execution of the express purpose to give them, is a mere nullity, until the death of the donor, and that the gift itself is not allowed to take inception until the donor has lost the power of making a will; thus interpolating it as a privilege between the departure of all the energies of the donor, and the departure of his life, and putting it very much upon the footing of a nuncupative will. My view is entirely different. The power to give is co-ordinate with the power to sell. The courts have as much right to abridge by construction a man's right to sell that which is his own, as his right to give it either absolutely or conditionally. There is much less impolicy in allowing men the free exercise of the right of property, than there is in refusing it. But, to refer to authorities. There is no decided case in which any such principle is allowed.

In Jones *v.* Selby, *Prec. in Chan.* 300, there were three years between the gift and the death of the donor; yet the chancellor laid no stress upon the circumstance. So far from it, he takes pains to defeat the gift upon *other* grounds. He goes so far as to say, that he *might presume fraud*, unless the contrary was proved; and he admits, that if the plaintiff had proved that the testator did not intend the bequest in his last will to be in satisfaction of a legacy given by a former will, the gift, the *donatio mortis causâ, must have stood.* (*Page* 304.)

In Hill *v.* Chapman, 2 *Bro. Ca. in Chan.* 612, the gift appears to have been made during health, and a considerable time before the death of the donor. Yet Lord Thurlow sustained it; not however

[Adams v. Nicholas.]

as a *donatio mortis causâ by implication,* or by force of any supposed *tacit* condition, but as a *donatio mortis causâ* made upon *express* condition.

If this decision be examined upon rational principles, it would be difficult to controvert its correctness. The donor was the owner of the things (two notes) given. He was competent, in all respects, to exercise his rights of property. He did so by delivering them indorsed to the donee, with direction to open the enclosure as soon as he was dead. He said he gave in that manner to prevent his daughter knowing how much he gave. If such a transaction be unlawful, it must be so for some technical reason, at variance with common law and common right. Lord Thurlow thought it a *donatio mortis causâ.*

In Wells *v.* Tucker, 3 *Binn.* 369, there were three days between the gift and the death of the donor. The donor, though too unwell to finish the sketch of a will which he had commenced, does not appear to have been in the extremity of his last sickness. He certainly might have signed a will, as Holmes did in this case. On the trial of that cause, Yeates, J., charged the jury, that the delivery made them a good *donatio causâ mortis.* 3 *Binn.* 367. Afterwards, in bank, he thought that the evidence would have warranted the jury to pronounce the gift absolute in the first instance, and to take effect immediately, and therefore irrevocable in its nature. He added, nothing was said or hinted at of its being a conditional gift, in case of his death. *He gave the bonds to Tucker's children, equally to be divided between them,* and such might be a good present *donatio inter vivos.* 3 *Binn.* 372.

It is of no importance to the donee, after the death of the donor, *how* the gift operates. If a gift should be deemed at first conditional *causâ mortis,* still at the death of the donor the gift becomes absolute; the condition is then discharged; its value is gone; the title of the donee reverts to the delivery; and things are as they would have been if the gift had been absolute in the first instance. But, to the donor, in case of his recovery, (or of his desiring to make a different disposition of the thing given) it is important. In the one case the gift is irrevocable; in the other it is not so. Therefore it is that the question as to the limits in point of time during which a tacit condition will be annexed by operation of law to words of absolute gift, touches exclusively the interest of the donor. A liberal construction is for his benefit. In the cause of Wells *v.* Tucker,

[Adams v. Nicholas.]

Yeates, J. thought a condition should be implied from the peril under which the gift was made, (3 *Binn.* 369) but said the jury *would have been warranted* in finding the gift absolute (3 *Binn.* 372); that is, the same facts would have justified either conclusion.

And if it be true that the law will not imply the condition, unless the donor be in the extremity of his *last* sickness, then it would follow that if a man were to give, under serious apprehensions of death, by general words, (*without saying or hinting that he means the gift conditional upon the event of his death,* 3 *Binn.* 372) and he should recover, or should linger of his sickness a long time, the gift must be deemed absolute. Such a construction would put our law, as to practical purposes, upon the footing of the civil law, because a donor could be sure of the condition in those cases only in which it would be of no value to him, unless he made, at the time of the gift, express mention of death as the condition of it.

In Walter *v.* Hodge, 2 *Swanst.* 97, there were eleven days between the gift and the death of the donor. He was, at the time of the gift, and had been for some time previous, in an indifferent state of health, but was not confined to his house, nor unable to transact business. The gift, it is true, was not sustained in this case, but the course of the cause shows that it was defeated entirely on other grounds. The master of the rolls, sir Thomas Plumer, declares, (*page* 108) that it is not necessary that the donation should be in the last illness. It is sufficient if made in contemplation of death, and upon the conditions stated. In another part of his opinion, he uses language which shows that if the condition be expressed, it is not necessary to show the existence of peril of death from a present sickness. (*Pages* 103, 104.)

In Hassel *v.* Tynte, *Amb.* 318, there was an interval of six weeks between the gift, and the death of the donor. In Lawson *v.* Lawson, 1 *P. Wms* 417, there were seventeen days. In Bird *v.* Mark, 7 *Taunt.* 224, the interval was one year. In Rankin *v.* Wiggelein, *Chitty on Bills* 791, two weeks. In Hunt *v.* Beach, 5 *Mod. Ch. Rep.* 351, one year and four days.

In several of the cases, the interval between the gift and death of the donor is not stated, and this is thought to weaken their authority. It would be more correct to suppose that the *circumstance was not* deemed important. And certainly, if it was not relied on as a matter of any moment in the cases in which it is mentioned, it is not

[Adams v. Nicholas.]

reasonable to suppose that any stress was laid upon it, either by the counsel or the court, in the cases in which it is not stated.

The case chiefly relied upon by the plaintiff, is that of Hedges v. Hedges, 3 *Prec. in Chan.* 269. Lord chancellor Cowper says, in that case, " a *donatio mortis causâ* is where a man *lies in extremity*, or being surprised with sickness, and not having an opportunity of making his will, but lest he should die before he could make it, he gives, with his own hands, his goods to his friends about him ; this, if he dies, shall operate as a legacy, but if he recovers, then does the property thereof revert to him." The same case is reported in *Gilb. Equity Rep.* 12.

It should be remembered, that the same judge decided the case of Jones v. Selby, *Prec. in Chan.* 300, two years afterwards, which has already been remarked upon.

I can hardly suppose the chancellor intended more than to exemplify the nature and the use of a donation *mortis causâ.* Certainly, if he intended to give an exact definition, his reasoning upon the facts in the case of Jones v. Selby was uncalled for.

Blackstone, 2 *Comm.* 514, adds to this description or definition, words which restrict the kind of gift to the *last* sickness. He calls it a *death-bed* disposition. Assuming that the donor is on his *deathbed,* and labouring under his *last* sickness, he says, the gift is accompanied with the *implied* trust that if the donor lives the property shall revert to him. I should conceive, the law, in implying a trust of this sort, has reference to the event of the donor's recovery, and therefore supposes that the donor *may not be* on his death bed, and that the sickness *may not* be his *last.* But, according to Blackstone, the law, if I may use the expression, first predestinates the death of the donor by the sickness then upon him, as a condition precedent to the power to give in this way, (for the donor must be on his *death*bed and ill of his *last sickness*) and then incurs the absurdity of implying a trust in favour of the donor, that the property shall revert to him *if he should recover.* Such an interpretation does injustice to the liberality and benignity of the law, as well as to its sense and science. This is one of the few inaccuracies which the admirable commentator has committed. He was doubtless misled by the loose expressions of lord Cowper in Hedges v. Hedges, *Prec. in Chan.* 269, which were not regarded, even by the chancellor himself, in Jones v. Selby. It does not appear from what source lord Cowper derived the passage in Hedges v. Hedges. In the notes to *Powel's*

I.—P

[Adams v. Nicholas.]

*Swinburne on Wills,* it is said to agree with the *Institutes, lib.* 2, *tit.* 7 ; but this is not correct.

Hedges *v.* Hedges is the earliest case of a donation *mortis causâ* reported. It is probable the chancellor took his notion from a nuncupative will, as regulated by the statute of *Char.* 2, adding to it the requisite of delivery, which is necessary to constitute the gift. Prince *v.* Hazleton, 20 *Johns. Rep.* 520. But however this may be, it is obvious, from an examination of the cases, that it has not been much regarded.

The weight of the authority of adjudged cases, therefore, as well as principle, is, I conceive, against the plaintiff.

This case has been discussed extensively upon the principles of the civil law ; but it is not necessary to pursue the investigation of it upon those principles. In many respects the rules of that system of jurisprudence, relative to gifts, differ from those of the common law. For example, all gifts, those even *inter vivos,* may, by the civil law, be revoked in some cases. *Justin. Inst., lib.* 2, *tit.* 7, *sect.* 2. And the last law of the code, *De Revocandis Donationibus,* lays down a general rule in the following terms : *Generaliter sancimus omnes donationes lege confectas firmas illibatasque manere, si non donationis acceptor ingratus circa donatorem inveniatur. Cod., lib.* 8, *tit.* 56, *l.* 10. When Swinburne wrote, a rule of this sort prevailed in England, in respect to bequests. *Swinb., part* 7, *sect.* 22. But a more important difference is this : the Roman civil law allows a universal donation *mortis causâ,* and a transfer (in execution thereof) of the possessions, during the life of the donor, (if the donor see fit to make delivery) revocable, nevertheless, at his pleasure. The donor is supposed, in such case, still to retain the property, though he has parted with the possession, unless he should *expressly agree,* at the time of the delivery, that the property in the thing, also, should be transferred. *Law* 2, *Digest, de Mort. causâ Donat.; Furgole, Traité des Testaments, vol.* 3, *pp.* 75, 76, *ch.* 8, *sect.* 1, *No.* 174. Our law does not allow the separation of the property from the possession, for such a purpose. The delivery of a chattel, as a gift, would be operative to transfer the property as well as the possession ; and the power of revocation, (except by force of a condition) though expressly reserved, would be void, for repugnancy, except in the case of a gift made in peril of death.

It may easily be shown, however, that some of the species of donations *mortis causâ,* by the civil law, would be valid transactions, upon

the principles of the common law, if executed by delivery; not, however, as revocable gifts, or as donations *mortis causâ*, but as gifts defeasible upon condition.

It remains only to inquire whether the will of Moses Holmes revoked the gift of the watches.

It has been shown that the transaction between Holmes and Nicholas was operative to pass the right to these watches. If the gift should be deemed conditional merely, and not of that species of conditional gifts which is technically called a donation *mortis causâ*, there can be no pretence that it was revoked by the will. Upon this view of the case, it is the interest of the plaintiff to maintain that the gift was made in consideration of death; for upon that depends the question which has been raised as to the revocable effect of the will.

It is admitted that the donor may, by an act *inter vivos*, revoke a donation *mortis causâ*; but upon principle and authority, it seems that he cannot do so by his will, even though he should attempt it by express words.

There are many things which a man may do by an act *inter vivos*, which he has no power to do by will.

A joint tenant may sever the tenancy by deed, but not by will. 6 *Binn*. 195, 196.

A husband may dispose of the chattels real of his wife by act *inter vivos*, but not by will.

The reason is this. A will or testament, so far as it respects the disposition of property, is the special designation of a person to take it, in opposition to the person on whom the law would devolve it. Of course, a will cannot deprive any person of a right which he does not claim by devolution or act of law, but by reason of a preceding gift or instrument. 1 *Sch. & Lefroy* 295.

To apply this doctrine to the case of a donation *mortis causâ*.

Delivery is essential to a gift. It is that which passes the title. The condition which made the gift defeasible was discharged by the death of Holmes. Of course, it is the same as if the condition had not been annexed.

The title of Nicholas reverts to the delivery, or, more strictly speaking, the indefeasible quality of it reverts, and is deemed to exist from the delivery. Of course, Nicholas claims by act *inter vivos*, and against Adams, the plaintiff, who is the executor of Holmes. His

title became indefeasibly vested (that is absolute) *eo instante* the personalty vested in the executor.

It is like the survivorship in joint tenancy in this respect, though unlike it in others. These, in fact, are the reasons given in *Roper on Legacies, ch.* 1 ; *Williams on Executors* 505 ; *Prec. in Chan.* 300. These books are authorities for this position, and they are founded in the reason and theory of the law.

The opposite argument is founded upon the idea, that a donation *mortis causâ* is a testamentary act. This is a mistake. Gifts of every species belong to the category of contracts, both by the civil law and our own ; and clearly, a conditional gift is a contract, at least so far as it respects the condition ; for he who accepts a thing upon condition to restore it in a certain event, virtually contracts to restore it if the event upon which it is to be defeated occurs. *Doctor and Student, Dial.* 2, *ch.* 33 ; 1 *Salk.* 301 ; *Furgole, Traité des Testaments, vol.* 4, *page* 337, *ch.* 14, *Nos.* 17, 18, 19.

The nature of the condition of a donation *mortis causâ*, seems to assign it a midway position between an act *inter vivos*, and a testament, and this probably has led to the mistake. Still it is essentially an act *inter vivos*, a contract taking effect from the delivery of the chattel.

Now a contract cannot be defeated by a will, unless the terms of the contract be expressed that it may be so defeated. But a donation *mortis causâ* by implication does not suppose any power of revocation by will in favour of the universal or residuary legatee ; because, by definition, a donation *mortis causâ* implies a preference of the donee to the heir. It occurs *cum quis magis habere eum velit cui donat, quam hæredem suum. Justin. Inst., lib.* 2, *tit.* 7, *sect.* 1.

If this be of the essence of the gift (and it is an elementary notion which has been adopted into the common law), Holmes's intention would, in contemplation of law, be defeated by allowing the general words of his will to revoke the gift. The very object of the gift, it must be presumed, was to prevent the devolution of the chattel to the person who would otherwise have been entitled.

Hence, a gift made after a will is a revocation *pro tanto* ; if made before, the will never operates upon it. It is not a part of the testator's effects ; he has given it away ; he must recall the gift and make it part of his effects during his life, in order that the will may attach upon it at his death and transmit it to his representative.

The paper drawn by Mr Brewster was not intended as a will.

[Adams v. Nicholas.]

The testimony connected with its execution explains the object of it. It was made in consequence of improper interference by the present plaintiff, and is merely a written testimonial of an antecedent act, designed to fortify and strengthen it. Besides, the watches were actually given and delivered a second time, contemporaneously with, or subsequently to, the execution of the paper. The actual delivery of the watches upon the terms orally expressed, at that time, is not nullified by the paper, even if it be a will.

This is a sufficient answer, also, to the idea that a donation *mortis causâ* is essentially oral; that *writing* changes its nature. The doubt in one of the books cited, whether a donation *can be made* in writing is misapprehended. The doubt is not whether writing nullifies the act, or changes its nature, but whether writing will dispense with delivery. Subsequent cases solve the doubt. Delivery of the chattel is indispensable in all cases of gift.

Besides, the elementary nature of this species of gift is taken from the civil law; and by that law it may be made *scriptis aut sine scriptis. Justin. Inst., lib. 2, tit. 7, sect. 2.*

And certainly it is a very extraordinary proposition, that a man cannot lawfully certify and attest any of his civil acts by writing. Why not by writing as well as by witnesses? It is true, a nuncupative will is made by word of mouth, without writing. That is the definition of it. Such wills are allowed in certain circumstances and under certain restrictions, because the testator cannot reduce his purposes to writing. But, in ordinary circumstances, writing is the indispensable evidence of the testator's last will and testament. There are other cases in which written evidence is the only evidence allowed. But no case can be found in which an act which is good without writing, is defeated because the evidence of its performance is better than it need be. Absolute gifts may be nuncupative, or they may be attested by writing. Why then may not a conditional gift be attested by writing? There is more reason that it should be so attested. The law places both upon the same footing. Either may be made orally, or by writing. The misapprehension upon this point arises from identifying a donation *mortis causâ* with a nuncupative will. It has been shown that it is a contract, and not a will. As a direct argument, therefore, it fails; as an analogy, it has no application. Upon the whole case then, I think there ought to be a new trial.

Rule discharged.